[Crim. No. 5228.   In Bank.   Oct. 15, 1951.]

THE PEOPLE, Respondent, v. DOIL MILLER et al.,
Appellants.

Milner J. Anderson and Joseph R. Rankin, under appointment by the Supreme Court, for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, J. F. Coakley, District Attorney, and Folger Emerson, Assistant District Attorney, for Respondent.

SPENCE, J.—Defendants Weathers, Miller and Dusseldorf were accused jointly of the murder of George Gaertner. on October 14, 1949, in the County of Alameda. Dusseldorf was also charged with three prior felony convictions. Upon arraignment, all three defendants entered separate pleas of not guilty. Dusseldorf then stood mute as to the alleged priors but he admitted them at the time of trial. After a joint trial before a jury, verdicts were returned acquitting Weathers of the crime charged but convicting Miller and Dusseldorf of murder of the first degree, without recommendation. Thereafter Miller and Dusseldorf made separate motions for a new trial, and each was denied. Judgments im-

posing the death penalty were thereupon imposed as to Miller and Dusseldorf. The cause is before this court upon an automatic appeal. (Pen. Code, § 1239(b).)

Appellants present different grounds for reversal. Miller challenges the sufficiency of the evidence to sustain his conviction of murder of the first degree. Dusseldorf maintains that the trial court erred in denying his motion for a new trial on the ground of newly discovered evidence. Neither appellant attacks the rulings of the court during the trial nor the instructions. Careful examination of the record compels the conclusion that appellants' contentions lack merit, and that the judgments of conviction should be affirmed.

On October 14, 1949, at about 1:30 in the afternoon, George Gaertner was found lying on the floor, mortally wounded, in Bloomheart's Tavern on San Pablo Avenue in Emeryville, where he was employed as a bartender. Irvin Condre, working at the time at a service station across the street from Bloomheart's, heard the firing of some shots. As he looked in the direction of the noise, he saw three colored men, wearing Army fatigue uniforms, leave the tavern, walk to the corner, and then break into a run to a car double-parked on a side street. They drove away before he could note the license number. Condre then entered the tavern, where he found no one except the bartender outstretched on the floor, moaning and in a semiconscious state, with blood on the front of his shirt. Without regaining consciousness, Gaertner died early the next morning. His death resulted from the hemorrhage of both lungs and the heart in consequence of gunshot wounds.

The police arrived at the tavern within a few minutes after Condre. Upon making a search of the premises, the police found no gun but they did discover two bullets, one embedded in a post and the other lying on the seat of a booth, where it had apparently ricocheted. Some three months later a gun was found by some workmen in the course of doing some excavating work in DeFremery Park in Oakland. Both the gun and the two bullets were introduced in evidence at the trial; and a ballistics expert testified that these two bullets had been fired from that gun.

Miller was first apprehended and taken into custody on November 8, 1950, more than a year after the commission of the crime. He was questioned by the Chief of Police of Emeryville, and he signed a written statement, made about 1 p. m., wherein he admitted that he had participated "about

one year ago'' in the ''Bloomheart stickup.'' He stated that one evening when he, Dusseldorf, and another colored man met in San Francisco, Dusseldorf said that he knew ''where to make some money, not stating where''; that the next day the three of them drove across the bridge to Bloomheart's Café on San Pablo Avenue; that upon entering the tavern, they found no one there except the bartender; that he, Miller, heard one of the two men with him say ''This is a holdup''; that Dusseldorf was carrying a revolver; that he, Miller, heard two shots fired, and that he and his two companions then fled from the tavern.

Later that same afternoon Miller made a similar, though more detailed statement to an assistant district attorney about the ''robbery and shooting,'' saying that he was ''willing to tell what happened'' there. Again Miller recounted the preliminary meeting of himself and his two confederates to plan a ''job'' to make some money; their trip the next day from San Francisco across the bridge to Bloomheart's Tavern on San Pablo Avenue; their entry into the tavern, with Dusseldorf being the only one carrying a gun; the remark of one of the men, as they walked by the counter, that ''This is a holdup,'' and immediately thereafter his hearing a shot; his running toward the door as he heard a second shot fired; and then the escape of all three in the car which had been left double-parked on the street. Miller stated that his part in the ''job'' was to act as a ''look-out,'' stationed near the door. Both of these statements were admitted in evidence only as against Miller.

On the evening of November 8, 1950, and following Miller's account of Dusseldorf's involvement in the Bloomheart ''job,'' Dusseldorf, who had also been taken into custody that day, gave his statement to the same assistant district attorney. While admitting his participation as one of the trio in the planned robbery of the tavern, Dusseldorf transposed the roles that he and Miller played at the scene of the homicide, Dusseldorf maintaining that he did not enter the place but stood at the door and that it was Miller who fired the shots just after their companion had said ''This is a holdup.'' Dusseldorf further stated that they had used his car, a grey Chrysler, to make the trip; that after the shooting, he drove all three to the home of a friend, where they changed their clothes, and that he, Dusseldorf, threw the ones which they had been wearing into a garbage can; that at that time he hid the gun in this friend's house but retrieved it some two weeks

later, when he finally disposed of it by throwing it into a "bunch of cement blocks" near where a swimming pool was under construction in DeFremery Park in Oakland. This statement was admitted in evidence only against Dusseldorf.

Condre, the service station attendant who went to Bloomheart's Tavern immediately after the shooting, positively identified Miller and Dusseldorf both at the trial and on the occasion of the preliminary examination a month after their arrest. He also testified that they were wearing "Army fatigue clothes" as he saw them leave the tavern. There was testimony that on the afternoon in question "a colored fellow" was seen putting "a pair of coveralls in the garbage can" on the premises where, according to Dusseldorf's statement, he and his two companions had gone to change their clothes; and that later that day the coveralls were recovered from the garbage can and turned over to the police. These coveralls were introduced in evidence and identified by Condre as similar in appearance to those worn by the three men as they left the tavern. Condre also described the "getaway" car as blackish grey in color.

Neither Miller nor Dusseldorf testified at the trial. Their separate extrajudicial statements were introduced in evidence without objection, and neither was challenged. The statements, as above detailed, agree in the main pattern of events up to a certain point—the identity of the person who allegedly did the actual shooting—with Miller and Dusseldorf each claiming that the other was the one who fired the gun.

In this state of the record, there is clearly no merit in Miller's attack upon the sufficiency of the evidence to sustain his conviction of murder of the first degree. The corpus delicti of the crime charged, murder, was established by the testimony of the witness Condre and others, without the aid of the extrajudicial statements of either Miller or Dusseldorf, and it is this testimony which constituted the basis for the admission in evidence of such extrajudicial statements. (8 Cal.Jur., Criminal Law, § 303, p. 234; *People* v. *McMonigle*, 29 Cal.2d 730, 738 [177 P.2d 745].) Considering solely the statements made by Miller—and disregarding the statement made by Dusseldorf, which was admitted solely against the latter—it is clear that the deceased was killed by Dusseldorf while Miller, Dusseldorf and their confederate were perpetrating or attempting to perpetrate a robbery. Such a killing constitutes murder of the first degree (Pen. Code, § 189; *People* v. *Cook*, 15 Cal.2d 507, 513 [102 P.2d 752];

*People* v. *Phyle*,' 28 Cal.2d 671, 674 [171 P.2d 428]), and each of the confederates acting jointly in furtherance of the common purpose is as accountable to the law as though he fired the fatal shot. (*People* v. *Martin*, 12 Cal.2d 466, 472 [85 P.2d 880] ; *People* v. *Waller*, 14 Cal.2d 693, 703 [96 P.2d 344].) ▇ In this connection, Miller apparently contends that the prosecution was bound to establish by independent evidence the corpus delicti of the crime of attempted robbery, as well as the corpus delicti of the crime of murder, before his extrajudicial statements concerning the planning and execution of the attempted robbery could be used to prove the degree of the murder which was admittedly committed. He cites no authority to sustain his contention, and it appears to be without merit. The corpus delicti of the crime of murder having been established by independent evidence, both reason and authority indicate that the circumstances surrounding the commission of the crime can be shown by the extrajudicial statements of the accused, and that such evidence of the surrounding circumstances may be used to establish the degree of the crime committed. It follows that Miller's attack upon the sufficiency of the evidence to support the jury's finding of his guilt of murder of the first degree cannot be sustained. (*People* v. *Cabaltero*, 31 Cal.App.2d 52, 57 [87 P.2d 364].)

▇ Nor may Dusseldorf prevail in his appeal upon the claim that the trial court committed reversible error in refusing to grant his motion for a new trial on the ground of newly discovered evidence. It appears that in support of his motion he submitted five affidavits—three by himself, one by his wife, and one by a friend—all to the effect that he was not at the scene of the crime but, in fact, was then ill and had spent most of the day in bed in his own apartment in San Francisco. According to his affidavit, his failure to present this alibi evidence earlier was correlated with a combination of circumstances : his wife's absence from the state during all the proceedings herein; her illness and lack of finances as reasons for the delay in her return to San Francisco until a few days after the conclusion of the trial; and his dependence on her testimony and that of a friend, whose place of residence he did not know, to establish his whereabouts that day.

The record shows that at the beginning of the trial Dusseldorf, in chambers, asked for a continuance to allow time for his wife to return to the state, but he made no claim then that she was an essential witness to prove an alibi nor was

his application made by motion with appropriate affidavits in support thereof. (8 Cal.Jur., Criminal Law, § 284, p. 212.) The court denied Dusseldorf's request on the ground that "there ha[d] been no showing [as] would warrant a continuance of the case," and Dusseldorf does not question the propriety of this ruling. As heretofore stated, Dusseldorf did not testify at the trial nor did he attempt to establish an alibi. He made no attack upon the validity of his statement admitting his participation in the Bloomheart episode in question—either as to the truthfulness of its recitals or its free and voluntary character. However, now, Dusseldorf claims that the. alibi evidence is "newly discovered" matter which he could not with reasonable diligence have produced at the trial. (Pen. Code, § 1181, subd. 7.) In denying Dusseldorf's motion for a new trial, the court said: "The matter of the defendant's whereabouts at that particular time is a matter peculiarly within the knowledge of the defendant himself. He must have known who he was with and where he was."

A motion for a new trial on the ground of newly discovered evidence is looked upon with disfavor, and the trial court's ruling in that regard will not be disturbed except upon a clear showing of an abuse of discretion. (*People* v. *Yeager*, 194 Cal. 452, 491 [229 P. 40] ; *People* v. *English*, 68 Cal.App. 2d 670, 673 [157 P.2d 429].) On the record here it plainly appears that Dusseldorf has shown no diligence in presenting evidence of his alibi. Facts that are within the knowledge of a defendant at the time of trial are not newly discovered (*People* v. *English, supra.*) While the colloquy between the court, Dusseldorf and his counsel at the opening of the trial, shows that Dusseldorf regarded his wife as a material witness, no explanation was there made as to the particulars wherein her testimony would be material nor why she could not be present for the trial. With regard to his failure to attack the validity of his statement placing him at Bloomheart's at the time in question, Dusseldorf suggests that on retrial he might make such challenge on the ground that it was obtained through force and duress, since he now has alibi evidence in aid of his defense; that at the trial he failed to take the stand because his bad criminal record would then have come before the jury at a time when supporting alibi evidence was not available to him as an offsetting factor. Such an argument suggests no more than that Dusseldorf was willing to take a chance on an acquittal but following conviction, now seeks

a new trial so as to present a defense which should properly have been made in the first place. As the record here stands, the significant factor is Dusseldorf's presence in court throughout the trial and his failure to attack the incriminating evidence against him, including his own statement of his participation in the crimes in question. Under such crcumstances, it cannot be said that the trial court abused its discretion in deny Dusseldorf's motion for a new trial. (*Cf. People* v. *Shelest*, 62 Cal.App. 213, 218 [216 P. 389].)

The judgments and the orders denying a new trial are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.

Appellant Dusseldorf's petition for a rehearing was denied November 7, 1951.