[Crim. No. 5074.    Third Dist.    Aug. 19, 1969.]

THE  PEOPLE,  Plaintiff  and  Appellant,  v.  MAYNARD
   JOHN CLAUSON, Defendant and Respondent.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Arnold O. Overoye, Deputy Attorneys General, for Plaintiff and Appellant.

William A. Ward, under appointment by the Court of Appeal, for Defendant and Respondent.

JANES, J.—Defendant was convicted after jury trial upon an information charging him with the crime of grand theft. His motion for a new trial, based on the ground of newly discovered evidence, was granted by the trial court and the People appeal. (Pen. Code, § 1238 subd. 3.)

### The Evidence

The evidence relevant to consideration of the issue on appeal shows that on Saturday, November 4, 1967, defendant was at the auto shop of Ronald Craig in Chico, California. During a conversation between the two men, defendant remarked that he planned to sell his 1966 Dodge automobile and purchase a new Chrysler at Roseville on the following Monday. Ronald remarked that his parents were interested in a later model car, and the two men arranged a meeting for the following day between Ronald's parents and the defendant at Ronald's home in Chico. Defendant told Ronald that he owed about $550 on the Dodge and Ronald relayed this information to his father.

Ronald's parents, Roe and Alma Craig, met defendant at Ronald's home on Sunday, November 5. The senior Craigs owned a 1961 Rambler which, after some discussion, Roe Craig told defendant he would have to dispose of in order to deal with defendant on the Dodge. Defendant departed, ostensibly to call Roseville to learn whether the auto dealer there would accept the Rambler toward his purchase of the Chrysler. He returned in about an hour and stated that he could use the Rambler on the Chrysler transaction. It was then agreed that the price the Craigs would pay for the Dodge (priced at $2,500 by defendant) was the sum of $2,300 in cash and their Rambler. At this point defendant told the Craigs that there was a small encumbrance against the Dodge —$500 to $565—which he would pay off at the bank the next day, November 6, and bring them the ownership certificate and the extra set of keys.

Mr. and Mrs. Craig and the defendant thereupon left Ronald's home and drove a few miles to the home of the senior Craigs in order to complete the transaction. There Mr. Craig indorsed and delivered to defendant the ownership certificate for the Rambler and wrote and delivered to defendant a personal check in the amount of. $2,300, after inscribing the check "in full for '66 Dodge." Mr. Craig also filled out a bill of sale form covering transfer of the Dodge, which contained a provision that defendant was to pay off the encumbrance on the Dodge. Defendant signed the bill of sale in the presence of Mr. and Mrs. Craig after it was entirely filled out and stated that he would pay off the bank and deliver the pink slip for the Dodge the next day. Thereupon defendant drove off in the Rambler, leaving the Dodge in the possession of the Craigs.

On Monday, November 6, Mrs. Craig appeared at the bank at opening time and transferred to their checking account from the Craigs' savings account sufficient funds to cover their $2,300 check. The check was paid by the bank on November 7.

Defendant failed to appear at the Craigs' home on November 6. Mrs. Craig testified that she "believed" it was on November 9 that he finally brought the extra set of Dodge keys to her home in Chico and assured her that everything was taken care of, and that the bank would mail out the pink slip for the Dodge in a couple of days. It was not forthcoming, however.

Their real crisis did not become apparent to the Craigs until the following week when they learned from the bank not only that defendant had failed to discharge the encumbrance on the Dodge, but that the loan balance stood at $2,008 instead of the $500 to $565 represented by defendant.

After many fruitless attempts to reach defendant, the Craigs finally made contact with him at his home on November 23. He admitted to them that there had been a "mix up" in the papers, and when faced with the fact of an encumbrance on the Dodge exceeding four-fold the represented loan balance, he stated, "well I've got the money now" and promised to meet the Craigs at the bank the following day in order to "straighten it all up." Instead, he telephoned the Craigs the following morning and told Mr. Craig that he had paid off the loan, and that the bank would mail out the pink slip in a few days. Mr. Craig then telephoned the bank and confirmed that defendant had, in fact, delivered to the bank a check for $2,008.

Relief for the Craigs was short-lived. Defendant's check was not honored by his own bank[1] and all further attempts by Mr. and Mrs. Craig to contact him were again thwarted until December 11, when they found him again at his home. They received nothing from him but excuses and more promises, none of which were fulfilled. The encumbrance on the Dodge was never discharged by defendant. Finally, to prevent repossession of the Dodge, the Craigs renegotiated the loan at the bank, assuming themselves a balance in the amount of $2,347. A Dodge automobile, two model years old, had cost them $4,647 in addition to their own 1961 Rambler.

Defendant testified in his own defense: He denied telling Ronald or the senior Craigs that only $560 was due on the Dodge; he told them he owed no more than $800. The agreement, he testified, was for the Craigs to pay $2,300 plus their Rambler for defendant's equity in the Dodge.[2] Defendant testified that he placed a check for $950 in the mail to the bank on November 4, and assumed, when he was talking to the Craigs, that the check had been picked up by the postman, although he found it still in his mail box on Monday morning, November 6, and removed it. Further, he had "never been advised," he said, until February of the following year that the account on which he wrote the $2,008 check in discharge of the encumbrance had been closed.

Defendant further testified that certain notations on the bill of sale for the Dodge—in particular, the phrase requiring that he "pay off the bank in full"—had been added to the instrument after its execution and delivery by him.[3] He produced a carbon copy of a receipt form—original of which he stated he delivered to the Craigs (but which they denied seeing or receiving)—which acknowledges his receipt of the Rambler and of the sum of $2,300 from Roe Craig for

---

[1]The check was stamped by the defendant's bank "account closed."

[2]The likelihood of the Craigs agreeing to pay $3,300 (the agreed value of the Rambler was $165) for a Dodge Coronet that is two model years old and has been driven sufficient miles to warrant new tires (as the testimony shows) appears to be remote, particularly as the Craigs were being advised by their son, Ronald, a licensed car dealer.

[3]The referenced notation on the bill of sale is written in ink of a different color from the other written data. The Craigs' testimony was that the questioned words were placed on the bill of sale before it was signed by defendant, and their explanation of the different colored ink is that there were two pens on the table at which the parties were sitting, and that in the course of filling out the bill of sale Mr. Craig stopped to talk several times; that in resuming his writing he apparently picked up one or the other of the two pens.

"Equity in 1966 Dodge '500'" and bears under a printed heading of "BALANCE DUE" the handwritten notation "not in excess of $800."

Important to the issue of newly discovered evidence, he denied seeing Mrs. Craig on November 9. Rather, in connection with that incident, he said that he called at the home of Mr. and Mrs. Craig on November 6, but found no one at home; he then stopped in at the auto shop of their son, Ronald, and delivered to Ronald the extra set of keys for the Dodge and requested Ronald to deliver them to his parents. (This was contradicted by Ronald.)

### The Motion

Defendant's motion was supported by his own affidavit and that of Merrill Mounts, a Yuba City motel owner, who declared that he was with the defendant in Yuba City on November 9, 1967 (the day that Mrs. Craig's trial testimony placed as defendant's visit to her home in Chico), from about 2:30 p.m. until 2 a.m. of the following day (November 10), and that on the dates of trial (July 8 and 9, 1968), he, Mounts, was out of town traveling and had left no forwarding address. By his own affidavit, defendant swore that he "did not know in advance of July 8, 1968, that Mrs. Craig would testify as she did relating to what occurred on November 9, 1967;" that he first learned during the trial of her "claim" as to what transpired on November 9, and that when she so testified he and his attorney attempted without success to contact Mr. Mounts to determine if "it was on the 9th of November, 1967" that he had been with Mr. Mounts.

### The Order

As we have noted, the sole issue here is the propriety of the trial court's order granting defendant's motion for a new trial on the ground of newly discovered evidence. (Pen. Code, § 1181, subd. 8.)[4] The People contend that the order was an abuse of discretion on the part of the trial court. We agree that it was.

Although the reported decisions have repeatedly stigmatized this ground for the motion by stating that a motion for a new trial on the ground of newly discovered evidence is looked upon with distrust and disfavor (see, e.g., *People* v.

[4]Penal Code section 1181, subdivision 8, provides that a new trial may be granted when ". . . new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. . . ."

*Greenwood* (1957) 47 Cal.2d 819, 821 [306 P.2d 427] ; 36 Cal.Jur.2d, New Trial, § 78, p. 241), it has been suggested that "the disfavor notion seems merely to be an unfortunate way of describing the necessary broad discretion in the trial judge to deny the motion where no sufficient showing is made of competency, materiality and diligence," and that the disparagement of this ground disappears once the motion has been granted by the trial judge; the presumption on appeal is then in favor of his order. (Witkin, Cal. Criminal Procedure (1963) Judgment and Attack in Trial Court, § 559, pp. 568-569; see *People* v. *Love* (1959) 51 Cal.2d 751, 758 [336 P.2d 169].)

■ The People recognize that the granting or denial of a motion for a new trial on this ground is a matter within the sound discretion of the trial court and that its ruling will be disturbed only when an abuse of discretion clearly appears. (*People* v. *Love, supra,* at p. 755; *People* v. *Newlan* (1959) 173 Cal.App.2d 579, 583 [343 P.2d 618].) Nevertheless, it is emphasized, the exercise of that discretion is circumscribed by certain guidelines founded upon a public policy which demands that a litigant exhaust every reasonable effort to produce at his trial all existing evidence in his own behalf, to the end that the litigation may be concluded. (See *People* v. *McGarry* (1954) 42 Cal.2d 429, 433-434 [267 P.2d 254] and *People* v. *Beard* (1956) 46 Cal.2d 278, 281 [294 P.2d 29].)

In furtherance of the desired goal, elements of a standard have been defined by which a trial court may properly exercise its discretion in such matters. The requirements of the standard are that (1) the evidence, and not merely its materiality, be newly discovered; (2) the evidence be not cumulative merely; (3) the evidence be such as to render a different result probable on retrial; (4) the moving party could not with reasonable diligence have discovered and produced the evidence at the trial; and that (5) these facts be shown by the best evidence of which the case admits. (*People* v. *Williams* (1962) 57 Cal.2d 263, 270 [18 Cal.Rptr. 729, 368 P.2d 353].)

■ While these guidelines are not applied inflexibly (see *People* v. *Beard, supra,* 46 Cal.2d p. 281), they have long been considered the logical prerequisites to the exercise of the trial court's discretion in such matters. (*People* v. *Sutton* (1887) 73 Cal. 243, 247 [15 P. 86].) Viewed in the light of the traditional requirements, defendant's motion was defective in several important respects.

1. *The evidence was not newly discovered.* Facts within the defendant's knowledge before termination of the trial are not newly discovered. (*People* v. *Greenwood, supra,* 47 Cal.2d p. 822; *People* v. *Roberts* (1963) 213 Cal.App.2d 387, 396 [28 Cal.Rptr. 839].) Moreover, as is shown, it is the evidence itself—not merely its materiality—that must be newly discovered. (*People* v. *Beard, supra,* 46 Cal.2d 282.)

Defendant, contradicting the testimony of Mrs. Craig, denied that he called at the Craigs' home in Chico on November 9 and assured Mrs. Craig that everything was taken care of and that the bank would mail the Dodge pink slip to her in a few days. The record discloses, however, that the defendant recalled, at trial, that he had been in the Yuba City area selling signs during the period of time Mrs. Craig placed him in Chico. He brought this to the attention of his counsel, who contacted Jim Horsfall, manager of the Maniac Manor Motel in Yuba City, where defendant had allegedly spent the afternoon and evening of November 9 with Horsfall and Mr. Mounts, the owner. Horsfall had no recollection of the event related to him, and counsel's attempt to contact Mr. Mounts was unsuccessful. The matter was apparently dropped by the defense; it was not mentioned to the trial judge nor was any request made for a continuance of the trial. Failure to make such request, with knowledge of the existence and materiality of the evidence, was a fatal omission. (*People* v. *Sainz* (1967) 253 Cal.App.2d 496, 500 [61 Cal.Rptr. 196] ; *People* v. *Fuller* (1940) 40 Cal.App.2d 18, 20 [104 P.2d 109].) Giving the defendant's contention its strongest thrust—and for the purpose of argument only—it is only the materiality of the new evidence, not the evidence itself, that may be termed of recent origin, and under the circumstances this is insufficient to support the motion. (*People* v. *Williams, supra,* 57 Cal.2d 270.)

2. *The defendant did not act with reasonable diligence to discover and produce the testimony of Mounts at trial.* Defendant's moving affidavit recites that he did not know prior to the time of trial that Mrs. Craig would testify as she did concerning the events of November 9. It is clear beyond question, however, that defendant is chargeable with lack of diligence in failing to verify the facts known to him at trial.

At the hearing on the motion for a new trial, it appeared that the police reports on the case—disclosed to defendant on a pre-trial discovery motion—contained Mrs. Craig's statement that the defendant came to her home in Chico on

November 9; defense counsel agreed that this was the fact and that he had discussed the incident with defendant before the trial. The same information became available to defendant at the time of the first two preliminary examinations conducted at the accusatory stage, hence the defense should have been alerted to this testimony of Mrs. Craig (as defendant concedes in his brief filed with this court).

Ample time was available between his arraignment in the superior court on May 10, 1968, and the trial on July 8 for defendant to investigate and verify the information available and known to him. The requirement of reasonable diligence was not met. (*People* v. *Ing* (1967) 65 Cal.2d 603, 614 [55 Cal.Rptr. 902, 422 P.2d 590]; *People* v. *D'Elia* (1946) 73 Cal.App.2d 764, 768 [167 P.2d 253].) Similar claims of inability to remember or locate an alibi witness have usually been viewed with disfavor. (*People* v. *Miller* (1951) 37 Cal.2d 801, 807-808 [236 P.2d 137]; *People* v. *Egbert* (1941) 43 Cal. App.2d 117, 118-119 [110 P.2d 495].) ▓ A defendant will not be allowed a new trial ''for the purpose of introducing evidence known to him and obtainable at the time of trial, or which would have been known to him had he simply exercised reasonable effort to present his defense'' at trial. (*People* v. *Williams, supra,* 57 Cal.2d 263, 273.)

▓ 3. *The new evidence is impeaching only and a different result is not probable on retrial.* Finally, we reiterate the principle that the newly discovered evidence must not be merely cumulative or impeaching; it must be such as to render a different verdict reasonably probable on a new trial. (*People* v. *Sousa* (1967) 254 Cal.App.2d 432, 435 [62 Cal. Rptr. 44].) ▓ Moreover, the probability of a different result, either by court or jury, must be determined by reference to an objective standard, based on all the evidence, old and new; the evaluation of the evidence is not to be undertaken subjectively to determine whether the new evidence would lead a particular trier of fact to a different conclusion. (*People* v. *Huskins* (1966) 245 Cal.App.2d 859, 862 [54 Cal. Rptr. 253].)

▓ If the proposed witness Mounts were to testify that he saw and was with defendant during the period in question (November 9), his testimony would be cumulative to that of defendant and would tend merely to impeach Mrs. Craig's testimony as to the fact and time of defendant's visit to her home. It would not directly affect the merits of the defense. Nor would it establish, for example, that the statements

attributed to defendant on that date were not made. At best it would show only that they were not made on November 9.

Overlooked by defendant is the fact that Mrs. Craug did not testify with certainty as to the date of November 9; she testified only that she *believed*[5] that the visit was made, the keys delivered, and the statements attributed to the defendant made on November 9. There is nothing in the old or new evidence to preclude the possibility that the defendant appeared at her home on November 8 or 10. On this record, defendant's attorney, in presenting the new trial motion to the trial court, bore down heavily on the probable falsity of Mrs. Craig's testimony by attacking her supposed certainty as to a date already contradicted by defendant and—hopefully—to be rebutted on retrial by Mr. Mounts.[6]

Analyzed objectively, the proposed evidence can only be described as impeaching; its effect on a new trial is speculative at best, not probable. When contrasted with cases which have affirmed the grant of such a motion, this conclusion is inescapable. For example, in *People* v. *Love, supra,* 51 Cal.2d 751, newly discovered evidence developed from a treatment of a prosecution witness for alcoholism, followed by recantation of the only direct trial evidence of premeditation in a murder case imposing the death penalty. In *People* v. *Williams, supra,* 57 Cal.2d 263, newly discovered evidence was found in a well-documented plot to falsely accuse the defendant. No case has been brought to our attention and we have found none in which a motion for a new trial has been successfully prosecuted on the basis of alibi evidence. Denials of retrials have understandably recognized that alibi evidence is singularly a fact within the defendant's knowledge. (See *People* v. *Miller, supra,* 37 Cal.2d 801; *People* v. *Fortune* (1935) 8 Cal.App.2d 588 [47 P.2d 755].)

---

[5] Her exact testimony is shown in the following exchange:
"Q Now when did you see Mr. Clauson again after November 5th?
"A He came out the following Thursday, the 9th, I believe."
[6] The argument went as follows:
"MR. WARD [defense counsel]: . . . the strong corroborating evidence they had in this case was the testimony of Mrs. Craig as to what occurred on November 9th, 1967; . . . which is directly refuted by the affidavit of Mr. Mounts, and it shows her testimony not only is false, but it is probably willfully false, because she was so specific as to the time this happened, and as to what transpired; the fact that she said the defendant appeared on that date and represented to her that he had paid off the encumbrance on the Dodge and that she would get the pink slip in a few days and that he also delivered to her the second set of keys to the Dodge. Now if he was not in Chico on that particular day, at that time, he could not possibly have done those things. . . ."

It appearing to us that the offered evidence was available to the defendant during the trial by the exercise of reasonable diligence; that it was not newly discovered in any true sense; and that in any event it was not such as to persuade a trier of fact to a different result on retrial, we conclude that there was an abuse of discretion in granting the motion for a new trial.

The order granting a new trial is reversed.

Friedman, Acting P. J., and Regan, J., concurred.