Filed 10/31/14  P. v. Miles CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>AARON LAMONT MILES,<br><br>        Defendant and Appellant. | A139217<br><br>(Contra Costa County<br>Super. Ct. No. 51121227) |

Following a trial by jury, Aaron Miles was convicted of the first degree murder of Alvin Torres in Richmond, California.  It was undisputed that shortly before the shooting Miles was within a block of the location where Torres was shot.  One eyewitness, who knew Miles, identified him as the shooter but later recanted the identification.

Following his conviction, Miles learned that 10 months after the Torres shooting, the murder weapon was seized from a third party in Oakland, California.  Based on that evidence, Miles moved for a new trial.  The trial court denied Miles's motion.  On appeal, Miles contends that the trial court abused its discretion when it denied his new trial motion and that the prosecutor violated her obligations under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).  We disagree and affirm.

1

# BACKGROUND

## I. *Procedural Background*

On December 21, 2011, the People filed an information charging Miles with three counts: (1) the murder of Torres (Pen. Code,[1] § 187); (2) street terrorism (§ 186.22); and (3) possession of a firearm after multiple prior felony convictions (§ 12021, subd. (a)(1)).[2] Counts 1 and 3 were accompanied by a criminal street gang enhancement (§ 186.22, subd. (b)(1)). Count 1 was also accompanied by an enhancement alleging firearm use causing great bodily injury or death (§ 12022.53).

On July 20, 2012, an indictment was filed charging Miles with dissuading a witness, Paul Williams, with force or threat (§ 136.1, subd. (c)(1)), accompanied by a criminal street gang enhancement (§ 186.22, subd. (b)(4)).

The trial court consolidated the two cases against Miles on September 5, 2012. The charge of dissuading a witness was designated as count 4.

A jury trial commenced on September 24, 2012. Presentation of evidence occurred over seven days between October 9 and October 17, 2012. The jury began its deliberation on October 18, 2012, and deliberated for six days, returning a verdict on October 26, 2012. The jury found Miles guilty on all four counts, with murder in the first degree, and found true the section 12022.53, subdivision (d) allegation that Miles had personally used a firearm causing Torres's death. The jury was unable to reach a verdict on the criminal street gang enhancements to counts 1 and 3. With respect to count 4, the jury found that the dissuasion of witness Williams was not with force or threat and not for the benefit of a criminal street gang.

On May 16, 2013, Miles moved for a new trial, based on alleged new evidence concerning Andre Moncrease, Jr., a person arrested in Oakland 10 months after the Torres murder while in possession of the gun used to shoot Torres.

---

[1] Unless otherwise indicated, further statutory references are to the Penal Code.

[2] The information alleged two prior felony convictions, one for a violation of section 12031, subdivision (a)(1) on March 27, 2007, and another for a violation of section 245, subdivision (b), on December 4, 2008.

2

The court denied Miles's motion for a new trial at a hearing on June 14, 2013, ruling that the evidence presented was not new evidence that had been diligently pursued before trial and that, in any case, the evidence was not material. The court then sentenced Miles to a prison term of 25 years to life for the first degree murder conviction, plus a consecutive term of 25 years to life for the section 12022.53, subdivision (d) enhancement. The court imposed a consecutive two-year term for the conviction on count 4 and a concurrent two-year term for the conviction on count 3. A term of two years for the conviction on count 2 was stayed, pursuant to section 654.

Miles filed a timely notice of appeal on July 9, 2013.

## II. *Factual Background*

On June 28, 2010, at 2:35 p.m., police were dispatched to the corner of Seventh Street and Florida Avenue in Richmond, California. There the police found Torres lying in the intersection with a bicycle between his legs. He had died as a result of nine gunshot wounds. One .40-caliber bullet was found under Torres's body, another was found beneath his belt, and four more were removed from his body during autopsy. Six .40-caliber shell casings were recovered near Torres's body.

## A. *Eyewitness Accounts of Washington and Marquez*

Earl Washington testified that he was sitting on his porch at the corner of Eleventh Street and Florida Avenue, about four blocks from the scene of the shooting, when he heard four or five gunshots. He began walking in the direction of the shooting and when he reached Eighth Street and Florida Avenue he saw a young African-American man running. The man was wearing black jeans and a black hoodie, with the hood up. Washington estimated his height at about 6 feet 2 or 3 inches.[3] The man had a thin build and no facial hair.

Washington gave a different account to the police immediately after the shooting. In that account, Washington had been in the front yard of a residence at 127 Seventh Street when the shooting occurred. Washington told the police that he had seen an

_____

[3] A detective estimated Miles's height to be 5 feet 10 inches.

African-American male approach the body that was on the ground, raise his hand towards the body from about three or four feet away, and fire two or three shots from a handgun. The man then ran from the scene. Washington described the man as in his early 20's, about 5 feet 8 inches to 5 feet 10 inches in height, with a thin build, wearing blue jeans and a black hooded sweater with the hood pulled over his head.

Margarata Marquez was unavailable to testify at trial, so the testimony she gave at the preliminary hearing was read to the jury. Marquez was in the area of Seventh Street and Florida Avenue and saw "three guys in the middle of the street." The three men were walking, all wearing white shirts, and the middle of the three was "in the bicycle." The man on the right, who was about 19 years old and about 5 feet 3 inches tall, wore black jeans and had a gun. The man with the gun shot at the man on the bicycle. The victim fell to the ground and the gunman fired about four more shots at him. The gunman began to walk away and the remaining man went to knock at the door of a house, asking for help.

Marquez was unable to identify anyone at the preliminary hearing as the shooter. She said that no one there had the same skin color or height. The shooter had a dark complexion. He was wearing a sort of hoodie, but the hood was not completely over his head. The shooter had "twisties" on top of his head, but no facial hair.

## B. *Video from Store Surveillance before the Shooting*

Khaled Alammari, the owner of a market at Seventh Street and Ohio Avenue, provided police a copy of video from his store's surveillance camera.[4] Alammari identified two of the people on the video as "Red" and Paul. "Red" was a name used by Torres. Alammari later identified a photograph of Williams as the person he knew as Paul. He told police that he had seen the two arrive by bicycle and enter the store together.

---

[4] The video was played for the jury, but is not part of the record before us. We rely on testimony concerning the video that is contained in the reporter's transcript.

The video showed a black sports utility vehicle (SUV) drive up to the store. A person identified by the police as Donnie Featherstone then entered the store. Finally, Torres and Williams entered the store, and as they entered, movement could be seen in the passenger side of the SUV. Inside the store, Featherstone and Williams appeared to shake hands, and then the three conversed. Detective Darrell Graham, who viewed the video, testified that he believed that Featherstone and Torres had an altercation, but was unable to explain what he saw in the video that supported this belief.[5]

## C. *Williams's Identification of Miles as the Shooter and Subsequent Recantation*

Graham interviewed Williams on July 1, 2010. Williams said that he and Torres were riding bicycles together when Torres was shot. Williams told Graham he heard gunfire and saw Torres fall to the ground but denied seeing who fired the shots. During the interview, Graham told Williams, "The rumor that I heard is that (Junior)[6] did it." Williams, however, continued to maintain, "I don't know. I ain't seen nothin', sir."

Graham interviewed Williams again on April 16, 2011, after Williams was arrested for possession of an assault weapon. A DVD of that interview was played for the jury. Graham told Williams that he knew who killed Torres but he needed to prove it.

---

[5] Graham was asked, "[W]hat was there about the physicality of Alvin Torres and Donnie Featherstone that made you believe that there was an altercation?" The officer replied: "Well, it would appear to me that they obviously had a conversation in the market, that they—they come across each other. Him and Paul Williams appeared to shake hands and that they all obviously talked. And it's certainly. . . . That may have had something to do with what occurred, that they all one another knew each other in some fashion and that may or may not have had something to do with what had occurred." However, when Graham showed the video to Miles, in an interview played for the jury, Graham commented: "But kind of looks like—like he—I think [Featherstone] fist bumps [Williams] and then they walk around each other and [Torres] comes walking up and they kind of look at each other and kind of—I think [Torres] walks—almost gives him like a little arm bump. [¶] . . . [¶] It was almost like a not cool arm bump where he might of got pissed off and I don't know if there's some prior—I mean the rumor on the street is that they had some prior problems and that's why I'm getting to this."

[6] As we note below, Williams later identified a photograph of Miles as the person he knew by the nickname "Junior."

He told Williams "I can make it go away so you don't get charged with this gun thing . . . ."

Williams explained that his "street instinct" was keeping him from giving a name. He said, "Oh man it's crazy 'cause y'all know. Dude, I heard the name a few times when I was in here. I heard (unintelligible) you said his name. You know who did it." Williams finally said that he didn't know the shooter's real name, but knew his nickname. Graham told Williams: "This is the only opportunity you're gonna get to make something like this, make this go away. So I'm offering to send you home tonight. Tonight. Like it never happened." Williams agonized about whether he should identify the shooter and have to "wear that jacket" as an informer for the rest of his life or go to prison for decades on the assault weapon charge leaving his child to grow up without a father.

Williams finally told Graham that the shooter was light skinned, muscular, and a little shorter in height than Graham, who is about 5 feet 9 inches tall. The shooter had no facial hair and wore a light gray sweater. He was a "[p]retty boy type." When asked what part of town the shooter was from, Williams said he was from "[C]entral." The shooter was with "another light skinned dude," but Williams did not know his name. Williams had first seen the shooter's companion in the store near where the shooting occurred. He described having seen the shooter and his companion in a "black or dark" SUV.[7] Graham showed Williams a photo lineup and Williams identified a photograph of Miles as the shooter. Williams said the shooter's nickname was "Junior."

Three days later, on April 19, 2011, Williams told Graham that he wanted to take back everything he had told him. Williams was hysterical and maintained that he had lied and had not even been at the scene of the shooting.

At the preliminary hearing, Williams refused to testify, even after the court granted him immunity. After the preliminary hearing, Williams wrote a letter to Miles's

_____

[7] It is unclear from Williams's interview whether he noticed the SUV only at the store, only after the shooting, or both.

counsel, asking whether he "did everything okay." However, Williams testified that he and Miles's counsel had never talked or otherwise communicated.

At trial, Williams recalled that he and Torres rode bicycles to the market on June 28, 2010. He recalled seeing Featherstone in the market. Williams testified that he rode away from the market on Seventh Street, heard shots, and saw Torres on the ground, but he did not see anyone near Torres or anyone running away. Williams testified that he did not see Miles running or shooting.

Williams stated that he told Graham that Miles was the shooter only because Graham kept mentioning Miles's name and Williams wanted to get out of jail. Williams denied that he had made a deal with Miles not to testify at the preliminary hearing, although they were housed in the same module in the jail for a time.

## D. *Miles's Statement to Police*

Graham interviewed Miles at the jail on October 13, 2010. A redacted DVD of the interview was played for the jury. Miles acknowledged that he had "got caught with a gun again" and stated that he was carrying a gun while on parole because flyers had been posted in Richmond with his picture and claims that he was responsible for shootings in North Richmond. He needed a gun to protect himself from his enemies, "North Richmon[d] and Easter Hill and 25, two fix, whatever."

Miles recalled that he and his "God-brother," Featherstone, visited the market at Seventh and Ohio Streets together in a dark-colored SUV. Miles said that he knew Williams and knew Red (Torres) by name, but not "by his face." When Graham showed Miles the store surveillance video, Miles recalled that Williams and another person rode to the market on bicycles. Miles explained that Featherstone, Williams, and Torres were all from the same "hood" in Richmond—"the Main." Miles affirmed that the conversation the three had inside the store was casual.

Miles said that he and Featherstone left the store before Williams and Torres. He did not remember where they went, except that they left Richmond. Graham told Miles that he knew that Featherstone parked the SUV around the corner and that Miles got out and shot Torres. Miles said that he had no problems with Torres and didn't even know

7

him.  When pressed to talk further about Torres, Miles said, "I can't talk about it right now," and "I just can't do it today man.  I can't talk about this today."  After bring pressed further, Miles said, "I just need to talk to my dad and my girl you know.  I can't talk about it right now till I talk to them."

## E.  *Miles's Note to Williams*

On December 12, 2011, three days after the preliminary hearing at which Williams refused to testify, Miles approached Officer William Lusareta in the county jail.  Miles, housed in Q module, asked Lusareta to deliver material to Williams, housed in D module.  He handed Lusareta an envelope with Williams's name on it.  Lusareta delivered the envelope to another officer because inmates are not allowed to send each other notes within the jail.  Inside the envelope was a transcript of a police interview of Williams.  Concealed between two pages of the transcript was a small handwritten note:  "I need to know.  Please tell me you put it on little momma, so stay solid.  If you need something let me know, write me tonight.  Put it in the name James.  I need to know what's up.  I kept my word like you did, bro.  Stay solid.  Write this address to let me know if it's still good.  Don't let them scare you.  Get at me ASAP.  Please let me know if it's good."

## F.  *Prosecution Gang Evidence*

Officer John Lopez testified for the prosecution as an expert on Richmond street gangs generally and the Deep C gang in particular.  Deep C is a criminal street gang whose members are from, or connected with, the territories it claims:  the Iron Triangle area of Central Richmond (which is actually the western part of Richmond) and much of the south side of Richmond, including the Pullman Townhouses and Crescent Park.  Deep C's primary activities are shootings, drug sales, robberies, and burglaries.  Deep C's rivals are the Project Trojans and the 40's in North Richmond and the Easter Hill Boyz on the south side.

Lopez opined that Miles is an active member of the Deep C gang, based on his criminal history, his contacts with police, his photos and tattoos, and his interview with

Graham.[8]  Miles has a tattoo that says, "Rydah 4 life."  In gang vernacular, according to Lopez, a "ridah" is someone who commits shootings for his gang.  Miles also appeared with other gang members in a rap video, titled "What You Do It For," that was posted on YouTube.  In the video, Miles displayed the hand sign for Nickel Block, a subset of Deep C.  Miles displayed the hand sign in other photographs in which Deep C gang members appeared.  Other members of Deep C had identified Miles as a member to Lopez.

Lopez testified that it was rumored that Torres had been involved in the shooting of a Deep C member in September 2009.  Lopez opined that a Deep C gang member's shooting of Torres in retaliation would benefit and promote the Deep C gang because it would enhance Deep C's reputation in the community as a violent street gang.  Lopez also opined that a Deep C gang member's shooting of Torres for disrespecting the gang member or his friend would benefit the Deep C gang because the shooter would show that he and his gang were tough, not weak.

It was Lopez's opinion that Williams was a member of the Maineline Boyz, a gang aligned with Deep C until a rash of shootings sparked a rivalry in the summer of 2010.

## G.  *Defense Gang Evidence*

James Hernandez, a university professor and former police officer, testified for the defense as an expert on gangs.  Assuming that the shooting of Torres happened very shortly after an interaction between two people in a corner market, which could have been either an altercation or a harmless encounter, in a neighborhood where a gang had been known to hang out, Hernandez opined that the shooting was not necessarily related to gang activity.  Hernandez explained that it is difficult to distinguish between a gang-related shooting and a non-gang-related shooting unless someone wore gang attire or yelled gang slogans.

---

[8]  In his interview with Graham, Miles assented to Graham's characterization of him as a "[C]entral cat."  Miles explained that the "only people that we're not cool with us, north Richmond and Easter Hill."

9

**H.** *Miles's Testimony*

Miles testified that he was raised in the Iron Triangle area of Richmond. When he was 18, a close friend was shot and killed, so Miles began to carry a gun because he feared the same fate. Miles was charged with and pleaded no contest to assault with a gun when he was 19 years old.

Miles explained that his "Rydah" tattoo represented a person who continues to rise up despite his bad situation. He explained that his hand signs in photographs showed that he lived on Fifth Street.

On the day Torres was shot, Miles was riding in a vehicle driven by Featherstone. When they stopped at the market, Featherstone went inside, but Miles remained in the vehicle. Miles saw Torres and Williams ride up on bicycles and enter the market. Miles did not know Torres and knew Williams only from having seen him in the area. When Featherstone exited the market, he and Miles drove to Featherstone's residence in Pittsburg. Miles learned that Torres had been shot because Featherstone received a phone call conveying that information about 20 minutes after the shooting.

Miles testified that his note to Williams in the jail expressed his need to know whether Williams would tell the truth. "Put it on little momma" meant that Williams should "put it on his daughter that he was going to do the right thing," which was analogous to swearing on one's grandmother's grave. "I kept my word like you did, bro," reminded Williams that Miles had forgiven Williams for having blamed the killing on Miles. Miles did not intend the note to be a threat to Williams.

Miles explained that Deep C was "not a gang thing" but rather his own personal identification with the neighborhood in which he had grown up. Miles agreed when Graham asked him whether he was a "[C]entral cat," but that was not an admission that he was a Deep C gang member.

Miles admitted that he shot a man named Anthony Peer in May 2008. Miles was with two people from Deep C at the time. Miles also admitted that he was in possession of a nine millimeter gun in July 2006 and was convicted for the offense.

10

**DISCUSSION**

Miles contends that the trial court erred when it denied his motion for a new trial and that the prosecutor violated her responsibilities under *Brady*.

**I. *The Denial of Miles's Motion for a New Trial***

A new trial on the grounds of newly discovered evidence is authorized by section 1181, subdivision (8), which provides that a court may grant a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given . . . ."

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

" 'A motion for new trial on the ground of newly discovered evidence is looked upon with disfavor. [Citation.] The granting or denial of such a motion is within the sound discretion of the trial court and, absent a clear showing of abuse of discretion, will not be reversed on appeal.' " (*People v. Shoals* (1992) 8 Cal.App.4th 475, 485-486, disagreed with on another ground by *People v. Fielder* (2004) 114 Cal.App.4th 1221, 1231.) "The claim of newly discovered evidence warranting a new trial is universally looked upon by the courts with distrust and disfavor. Public policy demands that a litigant should be compelled to exhaust every reasonable effort to produce at his trial all existing evidence in his behalf. It has been said that the circumstance that the testimony has just been discovered when it is too late to introduce it is so suspicious that courts require the very strictest showing of diligence." (*People v. Byrne* (1911) 160 Cal. 217,

11

225; accord, *People v. Baltazar* (1958) 159 Cal.App.2d 595, 599-600.) Even if the defendant shows that the evidence could not, with diligence, have been obtained before trial, the question will remain whether the evidence is material, i.e., "whether under all the circumstances of the case the . . . introduction [of the newly discovered evidence] upon another trial would render a different result reasonably probable" or whether, in its absence, the defendant was deprived of a fair trial. (*People v. Sing Yow* (1904) 145 Cal. 1, 4; accord, *People v. Sousa* (1967) 254 Cal.App.2d 432, 435.) A defendant who moves for a new trial based on newly discovered evidence " 'must make a strong case both in respect to diligence on his part and as to the truth and materiality of the evidence, and if he fails in either respect his motion must be denied.' " (*People v. McGraw* (1961) 191 Cal.App.2d 876, 883.)

The trial court did not abuse its discretion in denying Miles's motion for new trial because Miles failed to demonstrate either that he could not, with the exercise of due diligence, have obtained the evidence before trial or that the evidence would likely have produced a different result upon a new trial.

Immediately prior to trial, defense counsel informed the trial court that she was aware the Oakland police had seized a gun and that a ballistics report showed the gun had been used to kill Torres. Counsel asked the court to compel the prosecutor to turn over the Oakland police report, which counsel had subpoenaed from Oakland but had not yet received, and the ballistics report, which counsel claimed was in the possession of the Contra Costa County crime lab. The prosecutor denied she had possession of either report and claimed she did not intend to obtain or use them. The court invited defense counsel to provide it with authority to order that the reports be turned over since there was no evidence or indication that they were materials amassed by or even in the possession of the prosecutor or the Richmond Police Department—the investigating agencies in Miles's case.

Defense counsel suggested that there might be something exculpatory in these documents but when asked what that might be, she responded: "I don't know, I haven't seen it. If somebody was in the neighborhood at the time that this shooting occurred, and

12

they ended up in Oakland with the gun—" The prosecutor believed that the gun had been seized "up to a year after" the Torres homicide. The court observed that "the fact that the gun may have been in someone's possession at a different place and different time, I'm not sure how that's exculpatory here." Defense counsel did not disagree with that statement but instead shifted focus to a concern that the prosecutor might use the information to charge Miles with other crimes or present evidence of such crimes at trial. Based on the prosecutor's statement that she neither had nor intended to seek the documents, the court expressed its belief that these documents and evidence of other crimes would not "pop up" in this case and that "if it does pop up in this case, that will be a problem." Defense counsel apparently did not pursue the issue further and did not submit any brief concerning the court's authority to compel production of the reports; nor did she seek a continuance in order to investigate further.

About a month after Miles's conviction, the Oakland Police Department turned over the police report that had been at issue before trial. Defense counsel sought a continuance to provide time to investigate before filing a new trial motion, and the court ultimately granted it. The investigation revealed that on April 30, 2011, 10 months after the Torres shooting, the gun used to kill Torres was in the possession of Andre Moncrease, Jr., an African-American who, in 2009 had worn his hair in "twisties."

On this record, the trial court did not abuse its discretion in denying the motion on the ground that there was no showing that the evidence could not, with reasonable diligence, have been obtained before trial. Defense counsel knew about the police report and the ballistics report and that the Oakland police had seized a gun that was the same as the one used to kill Torres. The trial court invited her, but she declined, to provide further authorities on her motion seeking to compel the prosecution to obtain and turn over these materials and to make a showing of their relevance. Defense counsel also could have sought, but did not, a continuance to allow her to pursue that discovery. (See *People v. Clauson* (1969) 275 Cal.App.2d 699, 705 [failure to request a continuance was

13

a "fatal omission"].) It is likely that had counsel done either, she would have been able to amass the same evidence she claimed provided grounds for a new trial.[9]

Moreover, despite having had six months to investigate from the time she received the Oakland police report until the new trial motion was heard, the evidence defense counsel introduced was equivocal and attenuated, at best. One witness, Jose Osuna, who had been interviewed but not called by the prosecution, was unable to identify either Miles or Moncrease as the person who shot Torres. A second witness, Marquez, whose testimony at the preliminary hearing was read at trial, still did not recognize Miles as the shooter and reiterated her prior testimony that the shooter had "twisties" in his hair and was 5 feet 3 inches tall. Marquez testified that a photograph[10] of Moncrease showed "twisties" in his hair but that those worn by the shooter were more in the front part of the face than those in the photograph. Marquez was unable to identify the photograph of Moncrease as the shooter. An Oakland police officer testified that on April 30, 2011, he approached Moncrease based on information that Moncrease was selling drugs and had a gun; that Moncrease ran and tossed a gun; and that the gun turned out to be the one that had been used to kill Torres. The officer described Moncrease as having dreadlocks, much longer than the "twisties" depicted in the earlier booking photograph.

The trial court did not abuse its discretion in holding that this evidence was not material, i.e., was not such as to render a different result probable on a retrial of the cause. The evidence presented by Miles in connection with his motion boils down to

---

[9] Miles argues on appeal that if we affirm the trial court's denial of his motion for a new trial because trial counsel was not reasonably diligent, we should nevertheless reverse because trial counsel rendered ineffective assistance by not seeking a continuance before trial. A claim of ineffective assistance requires a showing of prejudice (*Strickland v. Washington* (1984) 466 U.S. 668, 694) and our conclusion that the Moncrease evidence was not material to Miles's defense precludes a finding that the failure to timely offer it as evidence was prejudicial.

[10] The photograph of Moncrease was a booking photograph from an incarceration of Moncrease in the Contra Costa County jail. At the hearing on the new trial motion, the prosecutor stated, from information and belief, that the photograph was taken sometime in 2009.

14

this: (1) 10 months after the Torres homicide, Moncrease possessed the gun that was used to kill Torres; (2) Moncrease has a "Jr." suffix to his name; and (3) at some point in 2009, Moncrease had "twisties" in his hair. Miles made other allegations in his motion concerning Moncrease's height and weight, his current incarceration on a homicide charge, and his connections to Richmond, but, as the trial court pointed out, he presented no proof of these alleged facts. There was also no proof that, in addition to having a "Jr." suffix to his name, Moncrease was known as or was called "Junior."

The strongest evidence against Miles was Williams's identification of him as the shooter. Williams was told that if he identified the shooter, his weapons offense would "go away" and Williams later recanted his identification, raising the question whether Williams was lying when he identified Miles.[11] However, there was other evidence tying Miles to Torres and to the murder that corroborated Williams's identification: Williams's accurate description of the vehicle that Featherstone and Miles drove to the store the day of the murder; Miles's testimony that he and Featherstone drove to the store in Featherstone's vehicle; and Miles's testimony that he knew Williams and that he saw Williams and Torres ride up and go into the store. Miles thus placed himself close in time and place to the murder victim and the murder. By contrast, there was no evidence connecting Moncrease to Torres or the murder other than his possession of the murder weapon: he was arrested in Oakland; was not shown to have lived in Richmond; was not placed in Richmond, much less at or near the scene of the crime, on the day of the murder; and was not shown to know or have had any interaction with the victim. Given the 10-month period between the murder and Moncrease's possession of the gun, any inference from his possession of the gun alone that Moncrease murdered Torres was extremely weak. The trial court did not abuse its discretion in concluding it was not

---

[11] It was undisputed that Williams and Miles knew each other, and thus there was nothing to suggest Williams's identification of Miles was mistaken.

15

reasonably probable that Moncrease's possession of the gun in April 2011 would likely have produced a different result on retrial.[12]

Miles cites a number of cases in which possession of the murder weapon is held to be incriminating evidence, but in all of these cases there was much more that connected the person in possession of the murder weapon with the murder. (See *People v. DePriest* (2007) 42 Cal.4th 1, 44-45 [defendant not only possessed murder weapon, but also had motive and opportunity and upon arrest was in possession of property stolen from murder victim]; *People v. Carpenter* (1997) 15 Cal.4th 312, 361-362 [conviction supported not only by ballistics evidence showing same gun was used in two crimes, but also by multiple eyewitness identifications, evidence regarding distinctive jacket worn by both gunman and defendant, shoeprint evidence, and evidence that defendant owned car similar to gunman's].)

Miles also cites *People v. Hawkins* (1995) 10 Cal.4th 920, 955, in which the court noted possession of the murder weapon as incriminating. However, the possession in question was six days after the murder, not the 10 months here. (*Ibid.*) Moreover, evidence established the defendant's opportunity and his connection to a blanket in which the murder victim was wrapped. (*Ibid.*)

In sum, we cannot say the trial court abused its discretion in denying the motion for new trial.

## II. *Alleged* **Brady** *Violation*

Miles also maintains that the court abused its discretion in denying his motion for a new trial "for the additional reason that the prosecutor violated her discovery obligations under *Brady* . . . by refusing to obtain and disclose the evidence that the gun

---

[12] Miles makes much of the fact that a 2009 photograph of Moncrease showed him sporting a hair style he describes as "twisties," and the fact that Marquez testified that Torres's killer wore "twisties." The evidence concerning Moncrease's sporting of "twisties" was not probative because the photograph was taken long before the murder; Moncrease's hairstyle upon arrest was described as "dreadlocks" rather than "twisties"; and Marquez did not testify that the man in the photograph (Moncrease) was the shooter or that the "twisties" in the photograph were similar to those of the shooter.

16

that killed the victim in this case was found in the possession of a third party." We disagree that the prosecutor violated her obligations under *Brady*.

In *Brady* "the United States Supreme Court held that a defendant's right to due process is violated when 'favorable' evidence that has been 'suppressed' by the prosecution is 'material' to the issue of guilt or punishment. The violation occurs even when the prosecution has not acted in bad faith and the favorable evidence has not been requested." (*In re Pratt* (1999) 69 Cal.App.4th 1294, 1312.) *Brady* and other federal precedent establish "a duty on the part of the prosecution, even in the absence of a request therefor, to disclose all substantial material evidence *favorable to an accused*, whether such evidence relates directly to the question of guilt, to matters relevant to punishment, or to the credibility of a material witness." (*People v. Ruthford* (1975) 14 Cal.3d 399, 406, overruled on another ground by *In re Sassounian* (1995) 9 Cal.4th 535, 545-546, fn. 7.)

"Evidence is 'material' [under *Brady*] 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.' [Citations.] The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court." (*In re Sassounian*, *supra*, 9 Cal.4th at p. 544.) "The defendant must make a showing of substantial materiality and even after this showing is made reversal is not required if the prosecution establishes the failure to disclose was harmless beyond a reasonable doubt. The prosecution does not have to risk reversal simply because a complete accounting of all conceivably exculpatory evidence is not made." (*People v. Ruthford*, *supra*, 14 Cal.3d at p. 409.)

We have already rejected Miles's contention that the Moncrease evidence was material to his defense. Accordingly, we reject Miles's contention that the prosecutor committed a *Brady* violation.

## DISPOSITION

The order of the trial court denying Miles's motion for a new trial is affirmed.

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.