Filed 12/24/14  P. v. Delgado CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>            Plaintiff and Respondent<br><br>       v.<br><br>GUADALUPE DELGADO,<br><br>            Defendant and Appellant | B251355<br><br>(Los Angeles County<br> Super. Ct. No. BA399785) |

APPEAL from the judgment of the Superior Court of Los Angeles County. Henry J. Hall, Judge.  Affirmed.

Julie Schumer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## SUMMARY

Defendant Guadalupe Delgado was convicted of kidnapping to commit another crime and second degree robbery, the jury found true the allegations of gang enhancements, and the trial court found true defendant's two prison priors. (Pen. Code, §§ 209, subd. (b)(1), 211, 186.22, subd. (b)(1)(C), 667.5, subd. (b).) He was sentenced to 15 years to life on the kidnapping count, two years for the prison priors, and his sentence on the robbery count was stayed under section 654. Defendant contends there was insufficient evidence of his identity as the perpetrator because of inconsistencies in the victim's accounts of the crimes. He also contends his trial counsel was ineffective for failing to object to improper character evidence, that his motion for a new trial based on newly discovered evidence was improperly denied, and that his pro. per. status was wrongfully revoked. Finding no merit in any of these contentions, we affirm.

## FACTS

The victim, J.A. testified that at 11:00 p.m. on July 8, 2012, J.A. was riding his bicycle on Menlo Avenue, going toward Vernon Avenue, when two men "popped out" of an alley, startling J.A. One of the men had an "X3" tattoo on the left side of his neck. The other man was larger and bald, and was wearing sunglasses. The man with the tattoo asked J.A. if he "bang[ed]," meaning whether he was a gang member. J.A. responded that he did not belong to a gang. The man with the tattoo claimed the Street Villains gang and told J.A. to get off his bike. J.A. responded, "Nah," and the larger man with sunglasses grabbed J.A.'s bag. J.A. panicked and yielded the bag. The bag contained an iPad, chargers, and other electronics.

J.A. pleaded for the men to return his things and let him leave, and the man with the tattoo told him to "shut the f--- up" and "[d]on't make me shoot you." The man was gesturing near his waist as if he had a gun, and J.A. believed the man was armed. The man with the tattoo directed J.A. to walk down an alley. The tattooed man was behind J.A. and the man with the sunglasses was in front of J.A. J.A. walked about 35 feet down the alley, until both men grabbed him and pushed him through a gate into what J.A. described as a "little house" or "shack."

2

Once inside the structure, the men directed J.A. to give them his wallet, his chain, and his cell phone. J.A. was reluctant to give up these possessions, and the men threatened to shoot him. J.A. then told the men, "Whatever," and they both began to search through J.A.'s pockets. The man with the sunglasses "snatched" J.A.'s chain, ripping it off his neck.

The man with the X3 tattoo told J.A. to "[t]ake everything off," and J.A. protested that the men had already taken all of his possessions. But J.A. then removed his shirt, shoes, and socks. The men told J.A. to take off his jeans, but J.A. refused to do so, fearing the men "were going to do something else" to him. J.A. then started screaming for help. The men panicked, told J.A. to "shut the f--- up," and told him he could leave. When the men opened the door to the shack, J.A. ran, in only his pants, to a friend's house nearby.

J.A. told his friend what happened, but did not call police. He did not report the crime because he was "scared" and "didn't want to go through that." The friend later dropped off J.A. at his girlfriend's house.

The following day, on July 9, 2012, J.A.'s girlfriend called police to report the crime. When the police responded to her call later in the day, J.A. made a report.

After making his report to police, that same day, J.A. returned to the scene of the crime, and thought he saw one of the assailants, the one with the X3 tattoo.[1] J.A. called police, who arrived and apprehended the man. The police then took J.A. to a field "show up" and asked if J.A. recognized the man. J.A. was sitting in a police car, and recognized the person as the assailant with the tattoo. J.A. recognized him because of his facial features. J.A. also told police that the assailant with the X3 tattoo walked with a limp.

When asked if one of his assailants was in court, J.A. responded that he was not sure, stating "he might grow some hair or something." The tattooed man had been bald.

After a brief recess, J.A. resumed his testimony. Defendant was asked to take off his glasses, and to expose his neck, which was covered by his shirt. J.A. then identified

---

[1]     J.A. later testified that he was not sure which of the assailants he saw, and that he thought it was the one who was wearing the sunglasses.

3

defendant as the assailant with the tattoo. J.A. confirmed that he had previously identified defendant as one of his assailants at the preliminary hearing.

During cross-examination of J.A., defense counsel highlighted a number of minor inconsistencies in the various accounts J.A. provided of the incident, including his testimony at the preliminary hearing, trial, and his statements to various police officers. J.A. told Los Angeles Police Officer Jimmie Marshall that he was riding his bike when a man with a limp approached him and claimed the "Street Villains" gang. J.A. admitted to providing inconsistent descriptions of defendant to police; in one description, defendant was five feet seven inches tall, in another he was six feet tall. J.A. also had told police, and testified at the preliminary hearing, that he only took off his shoes and socks, and not his shirt, during the robbery. However, J.A. clarified that he did take off his shirt, and must have been mistaken in his other testimony. J.A. had also told police that only defendant's cohort rifled through his pockets.

Defense counsel also cross-examined J.A. about his field identification of defendant. When J.A. identified defendant in the field show up, defendant was about 42 or 43 feet away from him. There were police officers on either side of defendant, and they appeared to be holding him up. J.A. claimed he recognized defendant's tattoo and his face. However, J.A. admitted he could not see the tattoo during the field show up. J.A. also knew that his assailant walked with a limp, and inferred defendant was hurt because the police officers were holding him up. J.A. admitted that he did not see defendant walk during the field show up.

Officer Marshall testified that he responded to the July 9, 2012 call to police reporting the crimes. J.A. told Officer Marshall about the robbery the night before, and described the suspects. J.A. described the first suspect to Officer Marshall as a male Hispanic, five feet seven inches tall, 175 pounds, 20 to 25 years old, wearing a brown shirt, black shorts, a black hat, and sunglasses. J.A. described the second suspect to Officer Marshall as a male Hispanic, five feet seven inches tall, 150 pounds, 20 to 25 years old, wearing a black shirt, blue pants, with an X3 tattoo on his neck. J.A. also told Officer Marshall that the first suspect, who was wearing sunglasses, walked with a limp.

Officer Marshall testified that J.A. said the first suspect approached J.A. and claimed "Street Villains." The second suspect approached J.A. from behind, snatched J.A.'s necklace, and took his bag. The second suspect then simulated a handgun and told J.A. to follow him to a nearby vacant house. Both suspects rifled through J.A.'s pockets.

Officer Marshall noticed a red bruise on J.A.'s neck. J.A. told him he got the bruise when his chain was snatched.

Officer Marshall admitted that he made his report from notes, and did not verify the accuracy of the report with J.A. once it was completed.

Los Angeles Police Officer Brett Rutkowski testified that he and his partner, Officer Chad Davis, responded to a report of robbery suspects identified on the street on July 9, 2012. One of the suspects was described as a male Hispanic, possible Street Villains gang member, walking with a limp.

Officers Rutkowski and Davis drove to an alley near 43rd and Menlo, after other officers located a suspect there. When they arrived, Officer Rutkowski saw other officers in the alley, attempting to secure a garage area behind an apartment building. The other officers detained a suspect, and Officers Rutkowski and Davis met with J.A., who was at a nearby location, and transported him back to the alley to conduct a field show up.

As they were driving to the alley, Officer Davis advised J.A. that they had a possible suspect, and that "it doesn't mean it is the suspect, but it might be; and that we wanted him to . . . I.D. him." During the identification, the suspect was a "handful of yards away . . . ." J.A. immediately identified defendant, telling the officers, "That's the guy who robbed me with the gun." At the time J.A. identified defendant, defendant had a shaved head and was not wearing glasses.

Officer Rutkowski testified that J.A. later gave him a detailed account of the robbery, stating that he was riding his bike at 11:00 p.m. when the defendant approached him and said, "This is Street Villains." Defendant simulated a handgun beneath his shirt, using his fingers. J.A.'s necklace and bag were taken from him. J.A. was then taken down an alley, to a small abandoned house, three or four houses away from where defendant stopped him. Once inside the structure, defendant told J.A. to take everything off, including his shoes, socks, and pants. Defendant kept pretending to have a gun under

5

his shirt. J.A. asked to leave, and defendant threatened to "blast" him if J.A. kept "f------ around." Eventually, J.A. was allowed to leave. Defendant told J.A. not to say anything about the incident.

When defendant was booked following his arrest, he had to receive a medical clearance because of his limp, as he had been shot recently. Defendant used a wheelchair while in custody.

During cross-examination, Officer Rutkowski testified that when he responded to the radio call, the description of the suspect was a male Hispanic, nearly six feet tall, heavy set, with an X3 tattoo on his neck, and walking with a limp.

Officer Davis testified that he and his partner received a radio call of a robbery suspect located at Vernon and Hoover. They were unable to locate any suspects, and were directed to contact J.A.'s girlfriend, who had reported the robbery. Officers Davis and Rutkowski later met with J.A., but were called away when other officers detained a possible suspect. After defendant was detained, Officers Davis and Rutkowski brought J.A. to defendant's location for a field show up. Officer Davis admonished J.A. that they had a possible suspect in temporary custody, and to not let the fact that he was in handcuffs "sway" his opinion. J.A. indicated that he understood the admonishment. When J.A. identified defendant, he was very confident.

During cross-examination, Officer Davis testified that when defendant was detained, he was carried out of the garage. Officers were holding defendant up when J.A. identified him. However, during redirect, Officer Davis clarified that defendant was merely having trouble walking, and the officers were assisting him. They were not carrying defendant.

Los Angeles Police Detective John Kim testified that he interviewed J.A. at the police station on July 10, 2012. J.A. told Detective Kim that he was riding his bicycle when a male Hispanic emerged from between two vehicles, and stepped in front of J.A., simulating a handgun. The man said, "This is 'Street Villains.'" Another male Hispanic approached J.A. from behind. The first male Hispanic grabbed J.A., and took him down an alley, while the other grabbed J.A.'s bag and bicycle. J.A. was taken to an empty shack. Once in the shack, the first male Hispanic told J.A. to give him his stuff, and not

6

to make him "mad" or he would shoot J.A. J.A. was scared and gave the men the contents of his pockets. The suspects next told J.A. to take off his clothes. J.A. took off his shoes and socks. The suspects then let him go.

Detective Kim testified that J.A. described the first suspect as five feet seven inches tall, 170 pounds, mid-20's, with a shaved head and an X3 tattoo on his neck. The second suspect was five feet eight inches tall, 180 pounds, mid-20's, with a shaved head, sunglasses, and a black eye. J.A. told Detective Kim that he returned to the area of the crime on July 9, and that he saw the second suspect there. J.A. called police, and was able to identify the first suspect in a field show up, based on his face, tattoo, and limp.

Los Angeles Police Officer Jose Campos testified that on July 9, 2012, he received a call that there was a robbery suspect near Vernon and Hoover. When he reviewed the "comments of the call," which are displayed on the patrol car's laptop computer, he noticed that the caller reporting the suspect was female, and that she was the girlfriend of the robbery victim.

Officer Campos had extensive training and experience with criminal street gangs. When he reviewed the details of the call, he believed he knew who the suspect was. Officer Campos knew defendant had an X3 tattoo, and that he walked with a limp, as defendant had been shot in the leg a week and a half earlier. The description was of a six foot tall man named "Remo." Defendant was known as "Primo," and was not quite six feet tall. However, Officer Campos was confident it was defendant as he knew that crime victims are often "shaky" or "distraught" and are not always accurate with their descriptions.

Before July 9, 2012, Officer Campos had other encounters with defendant. A week and a half before the robbery, Officer Campos had a consensual encounter with defendant. Officer Campos had other consensual encounters with defendant, "[w]hile conducting routine patrol both informal and detention settings." Therefore, Officer Campos was familiar with defendant and his appearance. Defense counsel did not object to this line of questioning or testimony. Officer Campos confirmed that defendant's hair was longer at trial than at the time of the robbery.

7

Because Officer Campos recognized defendant from the victim's description, he and his partner went to an alley where Street Villains gang members were known to congregate. As they approached the alley, Officer Campos saw two male Hispanics near a gate midway through the alley. One of the men stood, and the other disappeared out of view "real quick" when the officers' headlights shone on the gate. Officer Campos believed defendant was the suspect who disappeared from view. Officer Campos's partner immediately detained the male Hispanic who had not fled. Officer Campos entered the gate, which led to a parking lot, and looked for the fleeing suspect. He noticed an open garage door with the light on. He then saw the door being pulled closed and the light turned off. Officer Campos believed the suspect was in the garage, and called for additional backup.

Other units arrived two minutes later, and Officer Campos was able to confirm, with the owner of the garage, that no one was supposed to be in it. Officers ordered any occupants of the garage to come out, but received no response. Officers also attempted to open the garage, but discovered it was locked from the inside. Ultimately, officers were able to force the door open, and when Officer Campos entered the garage, he saw defendant laying on the floor. Defendant did not comply with various demands, so officers grabbed him and removed him from the garage. Defendant seemed to be "semiconscious" or in a "stupor." Defendant needed some assistance standing, so officers held him while the victim was brought to identify him.

Officer Campos directed some of the responding officers to take photographs of the alleyway, which had tagging indicating that the alley was a Street Villains stronghold, and tagging of defendant's monikers, "Primo" and "Little Termite." Officer Campos was familiar with defendant's monikers because "[d]uring some of the detentions he was an admitted gang member, [and] gave up those monikers." Campos also knew defendant to use the moniker "Cartoon."

Officer Campos opined that defendant was a member of the Street Villains gang, based on defendant having admitted his gang membership to Officer Campos, and based on his recent arrests, his association with other gang members, and the tagging of his monikers in gang territory.

8

During cross-examination, Officer Campos admitted that the X3 tattoo was common among Street Villains gang members. Significantly, however, Officer Campos testified that no other Street Villains members walked with a limp.

Los Angeles Police Officer Brent Williams also testified as a gang expert. He testified about the history and territory of the Street Villains gang, including its primary activities, and predicate offenses. Based on a hypothetical tracking the facts of this case, Officer Williams opined that the crime was committed for the benefit of the gang.

## DISCUSSION

Defendant makes a number of arguments on appeal, none of which is persuasive. He contends there was insufficient evidence that he was the perpetrator -- this argument resting on the above-recited, insignificant differences in the details of J.A.'s testimony -- and that Officer Campos's testimony that the suspect quickly fled from officers was irreconcilable with his testimony that defendant was then found in a nearby garage behaving as though he were "semiconscious" or in a "stupor." Defendant also contends his trial counsel was ineffective for failing to object to what he describes on appeal as "character evidence" of Officer Campos's previous encounters with defendant in "detention settings." He contends the trial court abused its discretion when it denied his motion for a new trial based on what he contends was "newly discovered" evidence, and that the trial court improperly revoked his pro. per. status.

We disagree with all of defendant's contentions. The existence of trivial inconsistencies in J.A.'s testimony does not vitiate the jury's finding that defendant was the one who robbed and kidnapped J.A. Moreover, counsel was not ineffective for failing to object to *admissible* evidence supporting Officer Campos's opinion that defendant was a gang member. And, even if the evidence had been improperly admitted (a finding we expressly do not make), it could not possibly have prejudiced defendant, as the comments were brief, and the evidence against defendant was overwhelming. Further, the trial court did not abuse its discretion when it denied defendant's motion for a new trial, as the motion was not supported by a witness affidavit, and in any event, did not demonstrate defendant had discovered any new evidence. Lastly, defendant's pro.

9

per. status was properly revoked after he wasted months of time, failed to follow proper procedures, and was disruptive and disrespectful of the court.

## 1. Sufficiency of the Evidence

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) "The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432.) Therefore, the reviewing court's "opinion that the evidence could reasonably be reconciled with a finding of innocence or a lesser degree of crime does not warrant a reversal of the judgment." (*People v. Hill* (1998) 17 Cal.4th 800, 849.) Reversal is only warranted when it clearly appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*Bolin*, *supra*, at p. 331.)

On appeal, we defer to the trier of fact's evaluation of credibility. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) Neither conflicts in the evidence nor suspicious testimony justify the reversal of a judgment, because it is the exclusive province of the trier of fact to determine the credibility of witnesses and the truth or falsity of the facts testified to. (*People v. Huston* (1943) 21 Cal.2d 690, 693, overruled on other grounds in *People v. Burton* (1961) 55 Cal.2d 328, 352.) A limited exception to this rule is when a witness's statements are physically impossible or inherently improbable. However, the falsity of the statements " ' " 'must be apparent without resorting to inferences or deductions. [Citations.]' " ' [Citation.]" (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 409.)

Defendant claims the evidence was insufficient to establish his identity as one of the perpetrators of the charged crimes. He claims that inconsistencies in J.A.'s account of the crimes render his testimony incredible. He also claims that Officer Campos's account of defendant's apprehension is improbable, as Officer Campos testified the suspect was fleeing rapidly, yet also testified defendant appeared to be semiconscious when he was apprehended in the garage, and police had to help him to his feet.

10

Although there were minor inconsistencies in J.A.'s various accounts to law enforcement and in his testimony, the jury was instructed on how to weigh the credibility of witnesses, and how to resolve conflicts in the evidence. The jury clearly found J.A.'s identification of defendant to be credible. It is not our job to second-guess that finding, when J.A.'s accounts were largely consistent. Any minor variances could easily be understood by the jury as stemming from the terrible anxiety and fear J.A. suffered during the kidnapping and robbery, in a setting of remote darkness and extreme vulnerability; fear and terror that continued to pervade his mind after he reached safety, due to the threats to take his life that were made during the commission of the crimes, and the threats of retribution if J.A. were to report the crimes. J.A. consistently told the same basic sequence of events and identified defendant as his attacker, and this evidence, alone, is sufficient to support his conviction. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Moreover, Officer Campos's testimony that he saw a suspect move away rapidly, and that defendant was later found nearby in an apparently semiconscious condition, is neither impossible nor improbable. The jury could reasonably believe defendant scuttled quickly away from the alley to the garage, where he pulled shut the door and locked it, turned out the lights, hid and, during the time it took police to get backup and break down the door, calmed down enough to mimic a "semi-comatose" condition.

## 2. Character Evidence

Generally, "evidence of a person's character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Defendant contends that Officer Campos improperly testified to previous encounters with defendant in "detention settings." Also, when testifying about defendant's gang affiliation, Officer Campos stated that his opinion was in part based on defendant's "recent arrests." Defendant admits that no objection to this testimony was made, and therefore the claim of error has been forfeited, but attempts to revive his claim by arguing that the failure to object constitutes ineffective assistance of counsel.

We find no merit in defendant's contention. In order to demonstrate ineffective assistance of counsel, defendant must show that counsel's performance fell below an

11

objective standard of reasonableness, *and* that he was prejudiced by counsel's performance. (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 467.) " '[T]he mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel.' [Citation.] If . . . the record fails to show why counsel failed to object, the claim of ineffective assistance must be rejected on appeal unless counsel was asked for an explanation and failed to provide one or there can be no satisfactory explanation." (*Ibid*.)

Here, there has been no explanation for why counsel did not object, but we can think of a compelling one; any objection would have been *meritless*. Officer Campos was testifying as a gang expert, and officers customarily rely on previous contacts and arrests in forming their opinion about a defendant's gang status. (*People v. Gomez* (2011) 192 Cal.App.4th 609, 619.) Moreover, defendant cannot possibly demonstrate prejudice, as the comments were extremely brief, were not likely to have been understood by the jury to imply bad character, and the evidence against defendant was overwhelming.

3.    **New Trial Motion**

    a.    *Background*

On September 5, 2013, defendant made a motion for a new trial[2] claiming newly discovered evidence. The motion was supported only by a declaration from defense counsel, offering the triple hearsay that a certain Kayla Brown would testify that she had told a defense investigator that on July 22, 2013, she was living on the streets in the area of Hoover and Vermont. The triple hearsay account of counsel was that: Brown met J.A. several days before the day the crimes were committed on July 8, 2012, and smoked marijuana with him. On July 8, 2012, Brown was hanging out with defendant and five other people in an abandoned house located on Menlo and Hoover. J.A. arrived at the house at 10:00 or 11:00 p.m., and Brown introduced him to defendant. J.A. was acting

---

**2**    This was defendant's second motion. He had earlier made one, while he was self-represented, that was denied by the trial court. After his pro. per. status was revoked, the trial court permitted defendant's counsel to make a second motion.

12

strangely, and Brown believed he was under the influence of methamphetamine. She asked him to leave, and he got on his bicycle and left. At 3:15 a.m., J.A. returned to the house and claimed to have been robbed. Defendant had never left the house that night.

At all times after the date of the crimes, Brown had been staying with her mother in Rancho Cucamonga, and consequently, she had not had any contact with anyone from Los Angeles. She recently started hanging out in the area again, and only then learned of defendant's prosecution. She would have come forward sooner had she known about the case, and was willing to do so now.

The trial court denied the motion, concluding that defendant "had knowledge of this potential witness long before this case was ever tried." The court also concluded that Brown's story was "inherently incredible."

b. *Analysis*

Defendant contends the trial court abused its discretion by denying his new trial motion based on newly discovered evidence. (Pen. Code, § 1181, subd. 8; *People v. Williams* (1988) 45 Cal.3d 1268, 1318 [new trial motion based on newly discovered evidence subject to abuse of discretion standard of review].) A motion for a new trial based on newly discovered evidence requires that the moving defendant "must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given." (§ 1181, subd. 8.) Here, defendant produced only the triple hearsay affidavit of his counsel describing statements Brown allegedly made to a defense investigator, and his motion could be denied on this basis alone. (*People v. Ethridge* (1962) 204 Cal.App.2d 279, 282-283 [declaration by counsel is insufficient to support a motion for a new trial based on newly discovered evidence].) Therefore, the denial of the defective motion clearly does not exceed the bounds of legal reason. (*Williams*, at p. 1318.)

Moreover, new trial motions based on newly discovered evidence are looked upon with distrust and disfavor, and the discretion of the trial court in ruling on such a motion will not be interfered with unless clearly abused. (*People v. Mandell* (1942) 48 Cal.App.2d 806, 818.) Here, if there were any truth to the story attributed to Brown, defendant would have had to know of the evidence before the time of trial, and could

have alerted counsel to conduct an investigation to locate Brown's present whereabouts. (*People v. Greenwood* (1957) 47 Cal.2d 819, 822; *People v. Clauson* (1969) 275 Cal.App.2d 699, 707; *People v. Knoll* (1962) 204 Cal.App.2d 267, 272.)

We find no abuse of discretion.

## 4.      Revocation of Pro. Per. Status

### a.      Background

The jury returned their verdicts on October 5, 2012. Defendant waived his right to a jury trial on his prior convictions, and a court trial was set for November 12, 2012. On November 6, 2012, defense counsel informed the court that defendant wished to file a *Faretta*[3] motion, to represent himself during sentencing. Defendant executed a *Faretta* waiver that same day. The *Faretta* waiver included a clause providing that defendant "understand[s] that the Judge may terminate [his] right to self-representation in the event that [he] engage[s] in serious misconduct or obstruct[s] the conduct and progress of the trial."

The trial court asked why defendant wanted to forgo representation by counsel, and defendant responded that he wanted to make a motion for a new trial, and that he wanted access to the law library. The trial court cautioned defendant that the sheriff's department might not grant him access to the law library. Defendant indicated that he understood, and still wished to represent himself. The trial court found defendant's waiver of counsel was made freely, intelligently, and knowingly, and granted him pro. per. status.

Thereafter, the trial on the priors and the sentencing hearing were continued a number of times, and defendant made numerous requests for "auxiliary funds" and various support services. On December 13, defendant sought $120, a private investigator, and a transcript of the entire trial proceedings, including jury selection. He sought additional funds later, and repeatedly provided incomplete subpoenas to the court, which the trial court rejected. The trial court granted him some funds, but denied other

---

[3]      *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

requests, finding defendant had not demonstrated good cause, as defendant had failed to specify why he needed a private investigator, and why the transcripts were necessary.

The court trial on the priors was held on February 20, 2013. Defendant stated he was ready to proceed. When the trial court stated its intent to proceed to sentencing, defendant protested, arguing that he had not yet completed his new trial motion, because he did not have a private investigator. He accused the court of denying him due process and treating him unfairly, and reargued various requests that the trial court had previously denied. He asked for a continuance to prepare his new trial motion, and the trial court granted him one final continuance.

Defendant filed his new trial motion on April 5, 2013, and the trial court heard the motion on May 24, 2013. At the hearing on the motion, when the trial court attempted to explain its basis for the denial of the motion, defendant became belligerent and repeatedly interrupted the court. Ultimately, when the trial court was unable to render a ruling without defendant interrupting, the court revoked defendant's pro. per. status, and reappointed the alternate public defender's office, indicating that it revoked defendant's pro. per. status because of his "ongoing misconduct and his unwillingness to abide by the court's requirements."

b.      *Analysis*

"[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." (*Faretta*, *supra*, 422 U.S. at p. 834, fn. 46.) "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." (*Ibid.*; see also *People v. Watts* (2009) 173 Cal.App.4th 621, 629 ["[A] defendant requesting the right of self-representation must possess the ability and willingness 'to abide by rules of procedure and courtroom protocol.' "].) "[A] trial court must undertake the task of deciding whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation." (*People v. Welch* (1999) 20 Cal.4th 701, 735 (*Welch*).)

15

We apply the abuse of discretion standard to the trial court's decision to terminate a defendant's right of self-representation. (*People v. Carson* (2005) 35 Cal.4th 1, 12; *Welch*, *supra*, 20 Cal.4th at p. 735.) "The trial court possesses much discretion when it comes to terminating a defendant's right to self-representation and the exercise of that discretion 'will not be disturbed in the absence of a strong showing of clear abuse.' [Citations.]" (*Welch*, at p. 735.)

Here, defendant repeatedly asked for resources and failed to justify why he was entitled to the requested resources to file a new trial motion and prepare for sentencing, and then became belligerent and disruptive when the court did not give him what he wanted. Defendant's misconduct and abuse of his pro. per. status fully supported the trial court's decision. Defendant was warned from the outset that his misconduct could result in revocation of his pro. per. status, yet he deliberately failed to heed the warning. We can find no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

GRIMES, J.

We concur:

BIGELOW, P. J.


FLIER, J.

16