Filed 3/16/15  P. v. Quintero CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>              Plaintiff and Respondent,<br><br>     v.<br><br>MANUEL QUINTERO,<br><br>              Defendant and Appellant. | B250025<br><br>(Los Angeles County<br> Super. Ct. No. NA092417) |

APPEAL from the judgment of the Superior Court of Los Angeles County. Tomson T. Ong, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb, and Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Manuel Quintero was charged by second amended felony complaint with 15 felony counts, including four counts of possession for sale of methamphetamine (Health & Saf. Code, § 11378; counts 1, 2, 3 & 6), five counts of possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); counts 4, 9, 10, 11 & 12), and one count each of sale, offer to sell, or transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a); count 5), possession for sale of cocaine (§ 11351; count 7), possession for sale of concentrated cannabis (§ 11378; count 8), possession of an assault weapon (Pen. Code, § 30605, subd. (a); count 13), possession of ammunition (§ 30305, subd. (a)(1); count 14), and possession of brass knuckles (§ 22010; count 15). It was also alleged as to counts 3, 6, 7, and 8 that defendant was personally armed with a firearm (§ 12022, subd. (c)). As to all of the counts, it was alleged that defendant had suffered five felony prison priors, had committed two serious or violent felonies, and that the offenses were committed to benefit defendant's gang (Pen. Code, §§ 186.22, subd. (b)(1)(A), 1192.7, 667.5, subds. (b) & (c), 1170.12, subds. (a)-(d), 667, subds. (b)-(i)).

Defendant was convicted by jury on all counts, and the gang and gun allegations were found true. In a bifurcated proceeding, the trial court found the priors to be true as alleged. The trial court sentenced defendant to the maximum term for each count, and ordered that the terms run consecutively (however, count 1 was stayed under Penal Code section 654), for a total of 39 years in prison. Defendant was also ordered to pay restitution and parole revocation fines of $10,000, among other fines and fees.

On appeal, defendant contends the trial court erred by: (1) denying his motion to bifurcate trial on the gang enhancements; (2) denying his request for a new trial based on newly discovered evidence; (3) ordering defendant to pay fines of $10,000 without assessing his ability to pay; (4) not staying the gun enhancements under Penal Code section 654; and (5) ordering his sentences on every count to run consecutively. He additionally contends insufficient evidence supports the gang and gun enhancements, the firearm and ammunition possession counts, and some of the drug possession counts

2

(counts 1, 3, 5, 6, 7 & 8).  Because we find no prejudicial error, and substantial evidence supports defendant's convictions, we affirm.

**FACTS**

**1.     March 29, 2012 Traffic Stop**

At 11:00 p.m., Los Angeles Police Officer Robert Castruita and his partner were on patrol in a marked police car in Wilmington.  Officer Castruita saw defendant driving a gray Toyota Camry.  He knew defendant from a previous encounter, and knew defendant was a gang member.  Officer Castruita thought the two air fresheners hanging from the Camry's rear view mirror were obstructing defendant's view, so Castruita made a U-turn to follow defendant.  While Officer Castruita was turning around, defendant picked up speed, and made a right turn.  As Officer Castruita attempted to follow defendant, defendant made another right turn.  Officer Castruita was able to catch up to defendant and activated his emergency lights.  Once he activated his emergency lights, Officer Castruita noticed "movement" between defendant and a passenger in the front seat of the car.  Defendant continued to drive for a short distance, and then pulled over to the shoulder of the road.

After defendant pulled over, Officer Castruita noticed more movement between defendant and his passenger.  It seemed as if they were passing things between them.  Officer Castruita ordered the Camry's occupants out of the car, and they complied.  When Officer Castruita approached the Camry, he noticed a digital scale and a small measuring scoop in plain view in the car's center console.  There was residue of a crystalline substance on the scoop.

Officer Castruita searched defendant, and found 23 plastic sandwich bags in his rear pocket.  Officer Castruita's partner, Officer Quiroz, also searched defendant, and found a key to a Vagabond Inn hotel room in San Pedro, and $664 cash.  Defendant gave officers an address on Motz  Street in Paramount.  Nothing was found on the female passenger, Denice Adcox.

Officer Castruita believed that defendant may have thrown drugs out of the car, so he and his partner conducted a foot search of the area.  They found two plastic bags

3

containing a substance resembling methamphetamine. The bags were located near the corner where the officers had momentarily lost sight of defendant. They were located in an industrial area, with very little foot or vehicle traffic. The bags were not covered in dirt or dust; instead, they appeared clean.

Defendant told the officers his nickname was "Gato." He had "Sureno" tattooed on his neck. Defendant was arrested.

## 2.      March 30, 2012 Search at the Vagabond Inn

Based on the above information, Officer Castruita obtained search warrants for the hotel room and the Motz address. Officer Castruita identified defendant's hotel room by calling the Vagabond Inn; the desk clerk informed Officer Castruita that defendant and Marcelina Ortiz were registered to room 205. Officer Castruita and other officers executed the warrant in the early morning hours of March 30, 2012.

When he entered the room, Officer Castruita discovered a semiautomatic .380-handgun wrapped in a white towel in the nightstand. He also found a digital scale, and a handgun magazine with a single live round in it. Officer Castruita also found a black laptop bag in the dresser, and four plastic sandwich bags. These bags were of the same type found in defendant's pocket. A Ziploc bag holding three smaller plastic bags containing a substance resembling methamphetamine was found behind the dresser. Officer Castruita also found a notebook containing "pay-owe" sheets, which typically document drug transactions. The room also contained mail in defendant's name, and the notebook contained two letters or notes to defendant.

Officers learned that Ms. Ortiz had another room rented at the hotel. On March 31, 2012, Officer Castruita executed a search warrant for room 210 that was registered to her. He recovered a "[l]arge amount of methamphetamine along with a gray flip phone that displayed 'Gato 16' on the screen." Defendant was not charged with any crimes related to room 210.

The general manager of the Vagabond Inn testified that Ms. Ortiz initially checked into room 205 of the hotel on March 26, 2012. On March 29, Ms. Ortiz was staying in room 205. She transferred to room 203 on March 30. Ms. Ortiz stayed at the hotel for a

total of five nights.  Hotel records listed defendant as an occupant of room 205, and noted that he had been issued a key to that room.[1]

### 3.    March 30, 2012 Search at Motz Street Residence

Besides the information defendant provided during the March 29, 2012 traffic stop, Officer Castruita independently verified defendant's address through DMV records, and through recent credit inquiries.

Los Angeles Police Detective Victor Brown assisted with the execution of a search warrant at Motz Street on March 30.  Officers knocked on the residence door and announced that they had a warrant, but after receiving no response, forcefully opened the door.  When officers entered the one bedroom studio (which was the main residence's converted garage), no one was there.  Detective Brown saw an open standing safe, and in the corner next to the safe, saw the barrel of a gun.  Brown looked inside the safe and saw what he believed to be drugs on an upper shelf.  The safe also contained some letters and identification papers, some belonging to defendant and some to his brother.  A bag of drugs was also found in a drawer next to the safe.

Elsewhere in the room Detective Brown discovered a "Mack 11 . . . assault pistol." The pistol had a threaded barrel so it could accommodate a silencer.  Police also found a Ruger .22-caliber rifle, and a Mosin-Nagant full action rifle.  In total, three rifles were found at the residence.  Officers also found large amounts of ammunition of various calibers, including .380-caliber pistol ammunition.  Ammunition for each of the guns was recovered from the location, and for guns that were not present at the residence.  Officers also found a high capacity magazine, which could hold more than 10 rounds.

Detective Brown testified to his extensive experience with firearms.  In his experience, the Mack 11 recovered from the residence qualified as an assault weapon under California law because it had a threaded barrel and a detachable magazine.

---

[1]    It is unclear from the record when Ms. Ortiz checked into room 210, which was searched by police on March 31, as the hotel's manager only testified about rooms 203 and 205.

Paperwork bearing defendant's name was found in the Motz Street residence. The residence also contained papers with the names Christopher Clark, Elsa Martinez, and Barry Daily, as well as others.

**4. May 31, 2012 Search at the Vagabond Inn**

Defendant posted bail and was released from jail following his March 29 arrest. The general manager of the Vagabond Inn testified that on May 30, 2012, defendant checked into room 321 at the hotel. He checked out on June 5, 2012.

On the evening of May 31, Officer Castruita executed a search warrant at a Vagabond Inn for room 321. As Officer Castruita walked into the hotel's office to obtain a key card for the room, he noticed defendant pulling into the hotel's parking lot in a green Honda Accord. Officer Castruita was under the impression that defendant saw him, because defendant suddenly drove off at a high rate of speed. Officer Castruita let other officers know that defendant was fleeing the area (the warrant also permitted officers to search defendant's person), and defendant was detained several blocks from the hotel, and was driven back to the hotel in a police car.

During the search of room 321, Officer Castruita found a large plastic bag containing a substance resembling methamphetamine behind the dresser. A smaller bag also seeming to contain methamphetamine was located in a laptop bag in a dresser. In a hygiene bag, Officer Castruitas found a DMV application for license renewal in defendant's name, and a cell phone. He also found a scale in the dresser.

When the green Honda was searched, officers found an iPhone and $636 in the center console.

**5. May 31, 2012 Search of 1437 Gaffey Street**

Los Angeles Police Officer Jarrod Wilson executed a search warrant at an apartment located at 1437 Gaffey Street in San Pedro. Officer Wilson had keys to the apartment that Officer Robert Hargrove had recovered from defendant when he was apprehended after fleeing the Vagabond Inn in the green Honda. The officers knocked on the door and announced that they had a warrant but did not receive a response. As they were using the keys to unlock the door, someone inside opened the door. There

were several people inside, and they were all taken outside while the police conducted their search. During the search, Officer Wilson found a bag of methamphetamine located within a black satchel. He also found an envelope with defendant's name on it. He also found several digital scales, a pay-owe sheet, and a pistol magazine.

Los Angeles Police Detective Joseph E. Harris testified that after the warrant was executed at 1437 Gaffey Street, he spoke with defendant, and provided defendant with *Miranda*[2] warnings. Defendant agreed to speak with Detective Harris, and when Harris broached the subject of the narcotics found in the residence, defendant told him that "everything" within the Gaffey Street location belonged to him.

**6.      June 13, 2012 Search at Sunrise Hotel**

On June 12, 2012, Los Angeles Police Officer Paul Winter was conducting surveillance on defendant at the Sunrise Hotel in San Pedro. (He had bailed out again after his second arrest.) Officer Winter was listening to conversations from room 326 that were audible to those in the hallway. He heard a male Hispanic speaking loudly from within the room, saying "I need to get black. I need to get black." "Black" is street vernacular for heroin. The man also said, "When I got out three or four years ago that bitch made me pay $90 for a 16th of an ounce." He also heard something said about "collect[ing] $200 from Cory." Officer Winter did not see who made the statements. At some point during his surveillance, he saw defendant in the hotel's hallway.

On June 13, Los Angeles Police Detective Robert Riske executed a search warrant on room 326 of the Sunrise Hotel. He knocked on the door and demanded entry into the room. He heard running inside the room, and Officer Jeremy Cohen opened the door with a ram. Officer Cohen entered the room first, followed by Detective Riske. Detective Riske saw defendant leaving the bathroom. Officer Cohen ordered defendant to the ground, and he complied. Detective Riske entered the bathroom and saw the toilet water swirling with a plastic bag floating on the water. Detective Riske scooped the bag

---

[2]      *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

7

out of the toilet; it appeared to contain methamphetamine. They also discovered a scale and pay-owe sheets in the room. Defendant was arrested.

Officer Cohen testified as a narcotics expert. In response to hypothetical questions based on the facts of the March 29 traffic stop, the March 30 search at the Vagabond Inn, the March 30 search of the Motz Street residence, and the May 31 and June 13 searches at the Vagabond Inn and Sunrise Hotel, Officer Cohen opined that the drugs were possessed for sale.

A recorded jail call between defendant and his girlfriend Cassandra (and a number of other individuals who were patched into the call by Cassandra) was played for the jury, and they were provided with an English-language transcript of the call.[3] In the call, defendant told Cassandra one of his houses had gone into foreclosure, because the mortgage had not been paid, and defendant was concerned about losing the $60,000 he had put down on the house. Defendant was willing to give the house to Cassandra's family, as they were interested in taking over the payments. Defendant also told Cassandra he had put $10,000 down on a timeshare, and was unsure about its status. He also discussed a $3,500 tax return he was owed. Defendant discussed how his financial position had been great, but that his "buddy from the . . . Wilmas . . . threw us down the toilet. We ended up owing . . . like 80 – 100 grand[,] that's why I was out on the grind doing – trying to do what I had to do and I end up getting caught . . . they hit up all my [unintelligible]. I lost a lot of [unintelligible] and then on top of all that paying all that money and it's just like – now – now, you know, I have some money across the border . . . ." Defendant said he owned two other properties in North Dakota.

---

**3** Defendant moved to augment the record on appeal to include the transcript of the call, but designated the wrong transcript in his motion. After receiving the incorrect transcript from the trial court, defendant did not again move to augment the record, or seek any other relief. We ordered transmittal of the exhibit by the superior court. (Cal. Rules of Court, rule 8.224(d).)

The parties stipulated to the identity and quantities of drugs confiscated, which included large quantities of methamphetamine (nearly a pound in total), 0.36 grams of concentrated cannabis, and approximately an ounce of cocaine.

**7.    Gang Evidence**

Officer Castruita testified as a gang expert.  He testified to his extensive training and professional experience relating to gangs.  He also testified to his personal life experience, growing up in Boyle Heights and South Los Angeles, both of which were heavily "infested" with gangs.  Officer Castruita is assigned to the Harbor Division gang unit, and for the last four years has been assigned specifically to the Rancho San Pedro gang.

Officer Castruita has established a rapport with many gang members, and they speak freely with him.  Hispanic gang members are proud of their gang, and often share information with police.  Officer Castruita described the legal definition of a gang, how a person becomes a gang member, and what a gang moniker is.  A number of the names mentioned during defendant's recorded jail call were monikers used by members of the Rancho San Pedro gang.

A member gains status in the gang by "putting in work" or by being violent.  Narcotics dealers bring in a lot of revenue, and they are forced to pay a portion of the proceeds to the gang.  That money is forwarded to the Mexican Mafia to provide funding for its protection of gang members in prison.  If a gang member does not pay this tax, they get no protection in prison.  The more revenue a drug dealer brings in, the more respect and status he attains.  This status is very important in Hispanic gang culture.  A gang member will use that respect to create fear and intimidation in the community.

Territory is also very important to gangs.  A gang's territory is the area they claim and in which they conduct their business, and they want to be the only gang to control that area.

The Rancho San Pedro gang fits the legal definition of a gang.  The gang has several cliques, which are smaller subsets of the gang.  The gang claims the entire city of

9

San Pedro as its territory. The Motz Street crimes occurred outside of San Pedro territory. All other crimes occurred within the gang's territory.

Respect and fear benefit the gang because the community is less likely to report crimes by the gang. Drug sales and weapon possession benefit a gang because drug sales make money for the gang, and guns protect the narcotics and intimidate the community.

The East Side Wilmas gang is located in Wilmington, but also operated in the area of the Motz Street house. There is a relationship between the Wilmas and Rancho San Pedro gangs. The Rancho San Pedro gang pays its tax to the Wilmas, and the Wilmas forward the money to the Mexican Mafia in prison. Defendant referred to owing money to the Wilmas in his recorded jail call.

The primary activities of the Rancho San Pedro gang are narcotics trafficking, gun trafficking, and grand theft. They are also involved in witness intimidation, theft, vandalism and murder. Officer Castruita also testified to predicate offenses by other members of the gang.

Officer Castruita first met defendant in 2008, when defendant was a passenger in a vehicle with another Rancho San Pedro gang member. During that contact defendant admitted to being a member of the gang with a moniker of "Gato." He had "Sureno" tattooed on his neck, a reference to the southern California Mexican Mafia.

Officer Castruita testified to the significance of "kites" or "wilas" (prison notes) that gave orders to "Pay Gato from RSP . . . ." It appeared someone wrote the notes on defendant's behalf. That someone was acting on defendant's behalf demonstrated that defendant had a high rank within the gang.

Officer Castruita opined that defendant was a member of the Rancho San Pedro gang based on his self-admission, his gang affiliated tattoos, his involvement with crimes committed by the gang, and his association with gang members.

Based on a hypothetical question tracking the facts of this case, Officer Castruita opined that the hypothetical person was acting "at the direction of, for the benefit of, or in association with the Rancho San Pedro street gang." His opinion was based, in part, on the quantity of methamphetamine, as the large quantity indicated that the person was

10

"higher up in the chain of command within the gang." Also, the facts indicated that the person was not working alone, as the number of guns recovered indicated that other gang members were providing protection. The crimes also benefited the gang because the money brought in allowed the gang to pay taxes to the Mexican Mafia. The guns also instill fear into the community.

Officer Castruita also opined that the crimes were committed with the specific intent to "promote, further, or assist criminal conduct by other gang members." His opinion was based on the same factors supporting his opinion that the conduct benefited the gang.

During cross-examination, Officer Castruita admitted that he had no evidence that defendant actually gave any money to other gang members.

At the close of the People's case, defendant moved to dismiss the case based on the sufficiency of the evidence. The trial court denied the motion.

**8. Defense Evidence**

Anthony Paul was called by the defense as a firearms expert. He examined the Mack 11 found at the Motz Street residence. When he dismantled the gun he discovered that many of its internal parts were missing, including the gun's firing pin. He opined that the weapon was inoperable and could not be fired. Mr. Paul agreed that the gun would be classified as an assault weapon, but did not consider it to be a "gun" because it could not be fired.

M.C. testified that she owned the Motz Street house in Paramount. She met defendant once when he had stayed at the house "temporarily for a short, short period of time" in December 2011 and January 2012. M.C. did not see defendant after January 2012. M.C. lived in the back of the house and rented the front of the house to defendant's brother, Alex Quintero. M.C. is home every day and would have known if defendant was there after January. She did not know if he left any property at her home. On the day police executed their warrant, only Alex Quintero and his two children were living in the front of the house.

11

Defendant testified. At the time of trial, he was 42 years old. He got his nickname, Gato, in 1982 because he played football and was fast. He grew up in Rancho San Pedro gang territory. He became involved in the gang in the 1980's when he was only 12. Defendant has been in jail for most of his life. He was most recently released from custody in North Dakota in August 2011. He stayed with his brother in the Motz Street house from October 2011 until the first week of January 2012. Since January, he had "very briefly" visited the Motz Street house but had not lived there. After leaving the Motz Street house, he moved in with his girlfriend and her parents in San Pedro. His girlfriend, Marcelina Ortiz, also rented some rooms in San Pedro at the Vagabond Inn and Sunrise Hotel.

On March 29, 2012, defendant was driving to Wilmington to look at a small boat to purchase. He was driving the car of his friend Denise Acosta. Defendant had made a wrong turn when he noticed Officer Castruita. He knew Officer Castruita from a previous encounter, where Castruita "called [him] out" of a bar, and told defendant he was surprised he was out of prison. After they made eye contact, Officer Castruita made a U-turn and started following defendant. He pulled defendant over, and placed defendant in handcuffs. There were no drugs in the car before defendant was pulled over. It was not his car, so he did not know what was in the center console. Officers never showed him any drugs when they pulled him over. Defendant bailed out of jail at 10:00 a.m.

Defendant had not visited room 205 at the Vagabond Inn on March 29. He was last there to take a shower on March 28. He was not aware of any drugs or guns in the room. Defendant denied that the documents found in the room were "pay-owe" sheets. He explained they are a scorecard for a dice game.

Defendant was arrested again on May 31, after a search of the Vagabond Inn and his sister's house. According to defendant, he was having a "crazy" night on the 31st. He and his girlfriend, Cassandra Kirby, were rushing to make it to the Laundromat before closing. By the time he dropped her off at the Laundromat, it was very near closing, so

12

he decided to bring her laptop back to the motel. He was pulled over by police as he left the motel.

Defendant did not have any guns or drugs at his sister's house. He did not have any drugs at the hotel either.

On June 13, 2012, defendant was staying at the Sunrise Hotel with his girlfriend Cassandra. The police barged in the room. There were never any drugs in the room. Defendant was not in the restroom, and had not attempted to flush any drugs down the toilet.

In regards to his recorded jail conversation with Cassandra, defendant testified that he got the $60,000 he referred to in the call from a 2006 settlement for a car accident.

Defendant has not dealt drugs since returning from North Dakota.

During cross-examination, defendant admitted to being a member of the Rancho San Pedro gang for 30 years. At the time of trial, he was still an active member of the gang. He denied committing crimes for the gang. He admitted that members of his gang engaged in drug dealing, and that violence "comes with" being in a gang. Defendant did not do anything for the gang; he and other members would just "hang out." Defendant denied that he had to "put in work" for the gang, reasoning that only members who are jumped in had to put in work. He was impeached with portions of his recorded jail call where he stated that he owed gang members from Wilmas $80,000 to $100,000. Defendant claimed his younger brother owed the debt.

Defendant admitted to a prior conviction for attempted murder. He also had a felony evasion conviction, and a conviction for receiving stolen property. The longest time he had been out of jail since 1993 was 90 days.

## DISCUSSION

### 1. Bifurcation of Gang Allegations

Before trial, defendant orally moved to bifurcate the trial of the gang allegations, on the basis that gang evidence was prejudicial and "really [has] no probative effect . . . ." The prosecutor countered that the evidence "is probative as to . . . his motive for even having the weapons and the drugs and also for selling the drugs." Defendant responded

that any reference at trial to the Mexican Mafia would be very prejudicial. This was the extent of the argument on the motion. The trial court denied the motion, finding the probative value of the evidence as to motive substantially outweighed any prejudice.

We review the denial of a motion to bifurcate the trial of a gang enhancement for abuse of discretion. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).) The legal basis for bifurcation of a prior conviction allegation also permits bifurcation of a gang allegation. (*Id.* at p. 1049.) However, "the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense. So less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation." (*Id.* at p. 1048.)

Gang evidence may be relevant to "identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Hernandez*, *supra*, 33 Cal.4th at p. 1049.) "To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*Id.* at pp. 1049-1050.) "Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself -- for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged -- a court may still deny bifurcation." (*Id.* at p. 1050.)

"The trial court's discretion to deny bifurcation of a charged gang enhancement is . . . broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Hernandez*, *supra*, 33 Cal.4th at p. 1050.) Because of the benefit of unitary trials, bifurcation is required only where a defendant can " 'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.]" (*Id.* at p. 1051.)

Defendant contends the court did not exercise its discretion in denying the motion, as it did not ask for an offer of proof from the People, and merely accepted the prosecutor's representation that the evidence was probative of motive. Defendant contends that if the court had sought an offer of proof, it would have discovered that the

14

gang evidence was not probative of motive. We are not persuaded. Officer Castruita testified that one of the primary activities of defendant's gang was narcotics sales. Many of the crimes (except those that occurred at the Motz Street residence) occurred in territory controlled by defendant's gang. The Motz Street crimes occurred in territory controlled by an affiliated gang, the Wilmas. The number of guns present at the Motz Street residence supported a finding that the crimes were gang related, because it indicated that other gang members were providing protection to defendant. Also, during a recorded jail conversation with his girlfriend, defendant admitted to owing a sizeable debt to the Mexican Mafia-affiliated Wilmas gang, and that he was dealing drugs to pay that debt. Clearly, the gang evidence was relevant to prove defendant's motive to commit the charged crimes.

The evidence was not unduly prejudicial, given its obvious relevance, and there was very little danger of the jury misusing the evidence. (Compare *People v. Albarran* (2007) 149 Cal.App.4th 214, 219, 227-228 [gang evidence was prejudicial when prosecutor admitted there was no evidence to prove the crimes were gang related other than defendant's status as a gang member] with *Hernandez*, *supra*, 33 Cal.4th at pp. 1045, 1049-1050 [when gang evidence is relevant to motive, any inference of prejudice is necessarily dispelled].) There was nothing significantly inflammatory about the evidence. Apart from testifying that one of the gang's primary activities was murder, Officer Castruita did not testify to any specific evidence of heinous or violent conduct by the gang. We find no abuse of discretion.

## 2. Sufficiency of the Evidence

Defendant contends insufficient evidence supports the gang and gun enhancements, the firearm and ammunition possession counts, and some of the drug possession counts (for the drugs and guns seized at the Motz Street residence and defendant's sister's house). Before a judgment of conviction can be set aside for insufficiency of the evidence, it must clearly appear that on no hypothesis whatsoever is there sufficient substantial evidence to support the judgment. (*People v. Redmond* (1969) 71 Cal.2d 745, 755; *People v. Johnson* (1980) 26 Cal.3d 557, 575-578.) The record must

15

be reviewed in its entirety when determining whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 316-320; *People v. Marshall* (1997) 15 Cal.4th 1, 34; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The substantial evidence standard of review is the same when the evidence of guilt is primarily circumstantial. (*People v. Holt* (1997) 15 Cal.4th 619, 668.)

### a. Gang enhancements

Penal Code section 186.22 provides for increased penalties for a crime "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Id.*, subd. (b)(1).) "It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation." (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.)

Defendant contends the evidence was insufficient to establish that he had the specific intent "to promote, further, or assist in any criminal conduct by gang members." (Pen. Code, § 186.22, subd. (b)(1).) Defendant acknowledges that "there may arguably be cases in which a gang expert's testimony about the principal activities of a gang combined with the very nature of the crimes could potentially satisfy the elements of proof necessary for" the gang enhancement. (See, e.g., *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382-1383.) However, defendant relies on nonbinding federal authority, *Garcia v. Carey* (9th Cir. 2005) 395 F.3d 1099 to argue that this case lacks adequate evidence of defendant's specific intent. *Garcia*'s construction of Penal Code section 186.22 was expressly rejected by our own Supreme Court in *People v. Albillar* (2010) 51 Cal.4th 47, 65, and does nothing to help defendant. (*People v. Williams* (1997) 16 Cal.4th 153, 190; *Forsyth v. Jones* (1997) 57 Cal.App.4th 776, 782.)

All of the evidence of defendant's crimes was recovered either in his gang's territory or in the territory of an affiliate gang. One of defendant's gang's primary activities was drug sales. Moreover, the number of guns and the amount of drugs

16

recovered indicated defendant was conducting a gang operation. There was evidence that defendant was a high ranking gang member, based on prison notes passed on his behalf. There was also evidence that defendant owed a debt to the Wilmas, and as a result had engaged in the charged crimes, clearly supporting the inference that this debt was his "tax" for the drugs sales he made. Officer Castruita's opinion that the crimes were committed with the specific intent to benefit the gang was not speculative, and was more than sufficient to support the jury's true findings on the enhancements.

### b. Gun enhancement

Defendant contends there was insufficient evidence that he was "personally armed" in connection with his possession for sale of drugs because there was no evidence that he was carrying a firearm or had access to one, as he was not present at the Motz Street residence, where the guns and drugs were found together. Penal Code section 12022, subdivision (c) provides that "a person who is personally armed with a firearm in the commission of a violation or attempted violation of Section 11351, 11351.5, 11352, 11366.5, 11366.6, 11378, 11378.5, 11379, 11379.5, or 11379.6 of the Health and Safety Code shall be punished by an additional and consecutive term of imprisonment pursuant to subdivision (h) of Section 1170 for three, four, or five years."

Our Supreme Court expressly rejected defendant's contention in *People v. Bland* (1995) 10 Cal.4th 991, 995 (*Bland*), finding that a person can be armed during a drug offense within the meaning of Penal Code section 12022, subdivision (c) when the drugs and guns are kept together, even though the defendant is not present when the contraband is seized. Specifically, the *Bland* court found that "[d]rug possession is indeed a 'continuing' offense, one that extends through time. Thus, throughout the entire time the defendant asserts dominion and control over illegal drugs, the defendant is criminally liable for the drug possession. [Citations.] And when, at any time during the commission of the felony drug possession, the defendant can resort to a firearm to further that offense, the defendant satisfies the statutory language of being 'armed with a firearm in the commission . . . of a felony.' [Citation.]" (*Id*. at p. 999.) Therefore, "when the prosecution has proved a charge of felony drug possession, and the evidence at trial

17

shows that a firearm was found in close proximity to the illegal drugs in a place frequented by the defendant, a jury may reasonably infer: (1) that the defendant knew of the firearm's presence; (2) that its presence together with the drugs was not accidental or coincidental; and (3) that, at some point during the period of illegal drug possession, the defendant had the firearm close at hand and thus available for immediate use to aid in the drug offense." (*Id*. at p. 995.)

Defendant attempts to distinguish this case from *Bland*, arguing that the location of the guns and drugs in *Bland* was indisputably the defendant's residence, whereas he offered evidence that he did not reside at the Motz Street residence, where guns and drugs were recovered in close proximity. We are not persuaded. There was ample evidence defendant resided at the Motz Street residence. On March 29, defendant told police that he resided there. That address was listed on his license and was the subject of recent credit inquiries. Papers belonging to defendant were found in close proximity to the guns and drugs at the Motz Street house. All of this evidence clearly supports the jury's finding that defendant knowingly, and contemporaneously, possessed the drugs and the guns.

### c. Gun and ammunition possession

Defendant contends that since guns and ammunition were found at locations where other occupants were present, and there was no evidence that defendant exerted any control over these items, there was insufficient evidence to conclude that they belonged to defendant.

Possession may be actual or constructive. Actual possession means the object is in the defendant's immediate possession or control. Constructive possession means the object is not in the defendant's physical possession, but the defendant knowingly exercises control or the right to control the object. (*People v. Pena* (1999) 74 Cal.App.4th 1078, 1083-1084.) Possession can be shown by circumstantial evidence and may be inferred from the defendant's conduct. (*People v. Rushing* (1989) 209 Cal.App.3d 618, 622-623.) "[M]ore than one person may possess the same contraband. [Citation.] Possession may be imputed when the contraband is found in a place which is

18

immediately accessible to the joint dominion and control of the accused and another." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410.)

The evidence here clearly supported a finding that defendant constructively possessed the guns and ammunition. There were drugs, a digital scale, large quantities of cash, plastic bags, guns and ammunition found in close proximity at locations where defendant admittedly stayed. This, coupled with Officer Castruita's expert testimony about gangs and the use of firearms in drug sales, clearly supports the jury's findings.

### d. Drug possession

Defendant makes nearly identical arguments regarding the sufficiency of the evidence for the drug charges stemming from searches of the Gaffey Street and Motz Street residences. Defendant does not challenge the sufficiency of the evidence as to the drugs recovered from the Sunrise Hotel and Vagabond Inn. As discussed, *ante*, defendant admitted to police he resided at the Motz Street address. Drugs were found there in plain view, and were stored near paperwork belonging to defendant. Moreover, he admitted that "everything" at the Gaffey Street residence belonged to him.

Defendant also contends there was insufficient evidence that the drugs found on the roadway following the March 29 traffic stop belonged to him. However, Officer Castruita testified to seeing defendant and his passenger pass something between them, and found a digital scale, a drug scoop, numerous plastic bags and a significant amount of cash in the car. The drugs were found on defendant's route, at a point where he had driven out of the view of the officers who were following him in a marked police vehicle, in clean bags, in a dirty, low traffic area. This evidence was more than adequate.

### 3. New Trial Motion

At trial, defendant testified that Officer Castruita's police car was equipped with a web camera during the March 29, 2012 traffic stop. Ultimately, defendant's testimony was stricken as speculative.

Over one month later, at the July 12, 2013 sentencing hearing, defense counsel made an oral motion for a new trial based on newly discovered evidence. Counsel stated, "[a]t the end of our jury trial, I learned that there was a possibility that there was a

19

camcorder or video recording and that was on Officer Castruita's police car on March 29, 2012, when they were following Mr. Quintero and allegedly he threw something out of the car.  [¶]  I was told at that time when we were almost finished with our trial that it would take over a month for us to subpoena this camcorder, if it existed.  So that could have been extremely important because that is what led to all the search warrants because Denise Adcox's alleged statement to the police was that he threw the drugs out of the car, which led to the first search warrant, which is really the basis for the May 31st search warrant and also the June 12th search warrant."

The prosecutor opined that any alleged video would not be helpful, as Officer Castruita testified that he did not observe defendant throw anything from the car, and defendant's car was out of sight when the drugs were thrown out.  Defense counsel countered that it was defendant's position that the police were right behind him the whole time.  The trial court denied the motion, finding that "it's speculative as to whether or not that was captured, weighing that against the testimony of witnesses in his particular case . . . ."  The court also concluded that there was ample time to discover this evidence.

Defendant contends the trial court abused its discretion by denying his new trial motion based on newly discovered evidence.  (Pen. Code, § 1181, subd. 8; *People v. Williams* (1988) 45 Cal.3d 1268, 1318 [rulings on new trial motions are reviewed for abuse of discretion].)  "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors:  ' "1.  That the evidence, and not merely its materiality, be newly discovered; 2.  That the evidence be not cumulative merely; 3.  That it be such as to render a different result probable on a retrial of the cause; 4.  That the party could not with reasonable diligence have discovered and produced it at the trial; and 5.  That these facts be shown by the best evidence of which the case admits." ' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)  New trial motions based on newly discovered evidence are looked upon with distrust and disfavor, and the discretion of the trial court in ruling on such a motion will not be interfered with unless clearly and manifestly abused. (*People v. Mandell* (1942) 48 Cal.App.2d 806, 818.)

20

"[O]ne who relies upon the ground of newly discovered evidence to sustain his motion for a new trial 'must have made reasonable effort to produce all his evidence at the trial, and . . . he will not be allowed a new trial for the purpose of introducing evidence known to him and obtainable at the time of trial, or which would have been known to him had he simply exercised reasonable effort to present his defense.' [¶] The term 'diligence' is 'incapable of exact definition because it is a relative term' [citation] and the 'diligence' of defendant in marshaling his evidence for the trial must be determined in the light of the 'peculiar circumstances' involved." (*People v. Williams* (1962) 57 Cal.2d 263, 273.) "Facts that are within the knowledge of a defendant at the time of trial are not newly discovered." (*People v. Miller* (1951) 37 Cal.2d 801, 807 (*Miller*).)

Here, defendant testified that Officer Castruita's police car was equipped with a camera. This "evidence" was plainly within the defendant's knowledge, and therefore cannot be considered newly discovered. (*Miller*, *supra*, 37 Cal.2d at p. 807; see also *People v. Williams*, *supra*, 57 Cal.2d at p. 273 [" 'Facts that are within the knowledge of the defendant at the time of trial are not newly discovered even though he did not make them known to his counsel until later' "].) Moreover, defendant did not present any "new evidence" at all, but rather the *possibility* that some evidence existed. Over a month (the amount of time counsel claimed would be required to subpoena the evidence) had lapsed at the time of the sentencing hearing, when the new trial motion was made, but no effort to secure this evidence had been made. Nor had any effort been made to obtain the evidence before trial. On this record, we can find no abuse of discretion.[4]

We also reject defendant's claim that he received ineffective assistance of counsel because his attorney did not seek a continuance to obtain the discovery. In order to demonstrate ineffective assistance of counsel, a defendant must show that counsel's

---

[4]    Defendant also claims the denial of his motion violated his rights to due process and a fair trial. We reject defendant's attempt to put a constitutional gloss on the claimed error, as we have concluded there was no error.

21

performance fell below an objective standard of reasonableness, *and* that he was prejudiced by counsel's performance. (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 467.) Defendant cannot demonstrate that he was prejudiced here, because, as discussed above, the evidence was not "new" within the meaning of Penal Code section 1181.

## 4.     Parole Revocation and Restitution Fines

The trial court ordered parole revocation and restitution fines of $10,000 pursuant to Penal Code sections 1202.4 and 1202.45. While ability to pay is a factor to be considered by the court in setting a restitution fine, section 1202.4, subdivision (d) expressly provides "defendant shall bear the burden of demonstrating his . . . inability to pay." Defendant did not object to the fines, and did not offer any evidence of his inability to pay them. Therefore, any claim of error has been forfeited. (*People v. Avila* (2009) 46 Cal.4th 680, 729-730.)

To the extent that defendant claims ineffective assistance of counsel for failing to object, the record reveals a clear tactical reason: Defendant had access to large sums of cash to pay the fines. Among other evidence, defendant testified to receiving a sizable settlement, and there was evidence that defendant owned two properties in North Dakota, had equity in another home (which was being foreclosed), owned a timeshare, and had money in Mexico.

## 5.     Penal Code Section 654

Defendant contends that Penal Code section 654 bars punishment for both the gun enhancements under section 12022, subdivision (c), and for being a felon in possession of a firearm for the counts stemming from the search of the Motz Street residence, reasoning the crimes all arose from the same incident.

Penal Code section 654, subdivision (a) provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The courts have interpreted the statute as barring multiple punishment arising from "a course of criminal

22

conduct wherein multiple violations are incident to an accused's single criminal objective." (*People v. Beamon* (1973) 8 Cal.3d 625, 638.)

Initially, we note that is unsettled whether Penal Code section 654 applies to enhancements which go to the nature of the offense. The Courts of Appeal are split on this question. (See *People v. Wynn* (2010) 184 Cal.App.4th 1210, 1219, fn. 8.) The California Supreme Court has held that section 654 does not apply to enhancements " 'which go to the nature of the offender.' " (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507.) However, our Supreme Court has not yet determined whether section 654 applies to enhancements (such as the ones involved here) " 'which go to the nature of the offense.' " (*Rodriguez,* at p. 507.) We need not address the question, because we find section 654 would not bar imposition of sentence for the gun enhancements even if it does apply here.

At issue here are defendant's sentences on counts 3, 6, 7, and 8 for possession for sale of methamphetamine, cocaine and concentrated cannabis while being personally armed with a firearm (the Pen. Code, § 12022, subd. (c) enhancements), and his sentences on counts 4, 9, 10, 11 & 12 for possession of a firearm by a felon (§ 29800, subd. (a)(1)). As to the armed drug possession enhancements, the evidence supports an inference that defendant's primary objective was to make money by selling narcotics. This objective is entirely absent from defendant's intent and objective in possessing a firearm as a convicted felon. The trial court impliedly found that defendant possessed the guns to achieve different, multiple objectives: to provide protection, to intimidate and instill fear in rival gang members and in members of the community, and to command respect. (See *People v. Vang* (2010) 184 Cal.App.4th 912, 917.) Therefore, section 654 would not prohibit the trial court from imposing enhancements pursuant to section 12022, subdivision (c), and sentence for defendant's violations of section 29800, subdivision (a)(1).

### 6. Consecutive Terms

At the sentencing hearing the trial court imposed the maximum term for each count, "because defendant was on parole at the time of the offense and he did not perform

23

satisfactorily. This is a significant aggravating circumstance, and the court does not find any mitigating circumstances." The court also imposed consecutive sentences on each count "based on different days, different time periods, and different locations."

The trial court's decision to impose consecutive sentences for each of defendant's counts constituted a sentencing choice under the determinate sentencing law, requiring the court to state its reasons for its sentencing decision. (Pen. Code, § 1170, subd. (c); *People v. Champion* (1995) 9 Cal.4th 879, 934.) However, a trial court's failure to adequately state its reasons is subject to the harmless error analysis, and remand for resentencing is not required where it is "not reasonably probable that a more favorable sentence would have been imposed in the absence of the error." (*People v. Avalos* (1984) 37 Cal.3d 216, 233; see also *People v. DeHoyos* (2013) 57 Cal.4th 79, 155.)

California Rules of Court sets forth the factors affecting the decision to impose a consecutive rather than concurrent sentence: "(a) . . . Facts relating to the crimes, including whether or not: [¶] (1) The crimes and their objectives were predominantly independent of each other; [¶] (2) The crimes involved separate acts of violence or threats of violence; or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior. [¶] (b) . . . Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except: [¶] (1) A fact used to impose the upper term; [¶] (2) A fact used to otherwise enhance the defendant's prison sentence; and [¶] (3) A fact that is an element of the crime may not be used to impose consecutive sentences." (Cal. Rules of Court, rule 4.425.) Aggravating circumstances may include that "the defendant was on probation or parole when the crime was committed;" "[t]he defendant's prior performance on probation or parole was unsatisfactory;" and the "crime involved a large quantity of contraband." (Cal. Rules of Court, rule 4.421(a)(10), (b)(4), (b)(5).)

Defendant contends that some of his crimes were committed during the same date and time, and therefore the trial court's stated reasons for imposing consecutive sentences on all counts are inadequate. Alternatively, defendant contends the trial court

24

erroneously made dual use of defendant's probation status when imposing the upper term and consecutive sentences. (Cal. Rules of Court, rule 4.425(b)(1).) We do not agree.

The trial court indentified adequate bases for its sentencing decisions. Defendant's status on parole (Cal. Rules of Court, rule 4.421(b)(4), and unsatisfactory performance on parole (rule 4.421(b)(5)) are *separate* aggravating factors, one of which would support imposition of the upper term, the other of which would support the imposition of consecutive sentences. (*People v. Bravot* (1986) 183 Cal.App.3d 93, 98 [The existence of just one criterion is sufficient to impose a consecutive sentence].) Also, some of defendant's crimes occurred at different times and locations. The trial court therefore identified several lawful bases upon which both the upper term and consecutive sentences could be imposed.

And, in any event, defendant has failed to establish that a more favorable sentence is likely upon remand. (*People v. Avalos*, *supra*, 37 Cal.3d at p. 233.) Other factors clearly supported the imposition of consecutive sentences, such as the fact that the crimes involved a large amount of contraband. (*People v. Hartsfield* (1981) 117 Cal.App.3d 504, 509-510; Cal. Rules of Court, rules 4.425(b), 4.421(a)(10).) "The reasons for the imposition of consecutive term[s] are manifest from the record." (*Hartsfield*, at p. 510.)

## DISPOSITION

The judgment is affirmed.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, J.

25